ANNA KORNIG v. WESTERN LIFE INDEMNITY COMPANY.[1]

July 19, 1907.

Nos. 15,161—(152).

**Life Insurance—Suicide.**

In an action brought by the beneficiary of a life insurance policy, which provided that there should be no recovery in case of death by suicide, intentional or unintentional, and whether the deceased was sane or insane at the time, it appeared in support of the defense of suicide that deceased was found dead, from a bullet in his head, with a pistol in his hand, in a room of a tenement leased by the principal witness for the insurance company. That witness testified that she had gone to the room, which she had leased to deceased, in answer to his complaint that it was not in order; that without a word he shot her; that she left the room; and that she did not hear a second shot. She denied any improper relations with the deceased. Her narrative was incomplete, and her testimony somewhat impeached. The jury found for the beneficiary. It is *held*:

(1) The trial court was not in error in receiving testimony that the deceased carried on his person a considerable sum of money, which was not found afterwards, nor in receiving in evidence a photograph of the rear of the premises, showing a stairway from the floor of the building on which the shooting occurred to the ground.

(2) Where the defense of suicide is asserted against an action by a beneficiary of an insurance policy:

(a) The burden of proving that the deceased committed suicide is upon the defendant.

(b) The presumption is against suicide.

(c) If the known facts are consistent with the theory of natural or accidental death, the presumption which the law raises from the ordinary motives and principles of human conduct requires a finding against suicide.

(d) When circumstantial evidence is relied on, the defendant must establish facts which preclude any reasonable hypothesis of natural or accidental death. Lindahl v. Supreme Court I. O. F., 100 Minn. 87, 110 N. W. 358, followed and applied.

(3) Only when the inferences or conclusions to be drawn from the facts in a case in which the defense of suicide is interposed to an action on an insurance policy are so clear and unambiguous that reasonable men, un-

[1] Reported in 112 N. W. 1039.

affected by bias or prejudice, would agree that the deceased intentionally shot himself, should a verdict for the beneficiary in the policy be set aside.

(4) A normal man is not driven to the desperation of suicide without some exciting cause of more than ordinary magnitude. The entire absence of motive, adequate or inadequate, inciting to self-destruction, was a circumstance to be considered by the jury in determining whether or not the defendant has borne the burden of proof of maintaining such a defense.

(5) The mere fact that a revolver was found in the hand of deceased was not conclusive that he committed suicide.

(6) The evidence in this case is examined, and *held* not to have shown suicide so conclusively as to have made it error for the trial court to have refused to set aside the verdict of the jury.

Action in the district court for Hennepin county to recover upon a life insurance policy. The case was tried before Holt, J., and a jury which rendered a verdict for $2,042 in favor of plaintiff. From an order denying a motion to set aside the verdict and for a new trial, defendant appealed. Affirmed.

This was an action to recover the sum of $2,000 under a policy of insurance held by the deceased husband of plaintiff and respondent in appellant and defendant company. Defendant denied liability because of a provision of the policy to the effect that in case the death of the insured should result from his suicide, whether he were at the time sane or insane, whether it were voluntary or involuntary, intentional or unintentional, the defendant company should be liable only for twenty five per cent. of the amount paid by the insured in assessments without interest. For that amount defendant offered judgment. The jury returned a verdict for the full amount of the policy. This appeal was taken from the order of the trial court denying defendant's motion to set aside the verdict and to grant a new trial. The testimony, construed, as it must be on this appeal, as favorably to plaintiff as reasonably may be, was in brief, as follows:

Deceased was a man of cheerful disposition. He lived happily at home with his wife, without quarreling. He was a kind father, and was devoted to his children. He had been moderately successful in business, and immediately before his death was in the possession of a considerable sum of money, amounting to several thousand dol-

lars, which he carried in cash in a canvas bag attached to his person. There was testimony to the effect that he had slept and lived at home, and got his meals at home, where he had all his things, including his clothing. His wife had seen him the day of his death, the night before his death, the night of the day before that, and every night so far as she knew. She thought, however, that he had been in Stillwater one night a week before his death. In brief, he lived happily and contentedly with his family, and spent the evenings of the days immediately preceding the tragedy at home. On the morning of that day he was in his usual health, and his manner was natural. In the afternoon he was found dead in a room in Minneapolis, which defendant's witness, a Mrs. B., testified he had rented from her. That witness said that she had known the deceased and his family for some time previously. She and her husband had rented the second and third floors of a building in Minneapolis. They sublet the upper floor—four rooms—to roomers. They had met the deceased on the street, and had been informed by him that his family were in California for their health and that he wanted a room. The wife of the deceased, however, swore that the witness Mrs. B. had seen her in Minneapolis about this time. On March 1 they had rented him a room. Mrs. B. testified that he had occupied the room all the time from then until April 12, the day of the tragedy. On that day, in substantially her own words, she was in the kitchen, when he stepped out into the hall and complained that his room was not in proper condition. She went upstairs and looked around the room, and started to come out of the door, and he was at the head of the stairs. He never uttered a word. He just stepped up and pointed the revolver. She heard the report, turned around, and dropped on her knees. Her head kind of went over, and she did not know whether it was two teeth, or a tooth and a bullet, that she spat out, but something rolled out. The bullet struck her in the lower part of the ear. Then, while resting on the bed, she said to deceased: "For God's sake, what did you do this for? Won't you speak? Won't you tell me?" He did not respond a word. She did not hear a second shot. She thinks she lost consciousness. How long she remained in the building is not clear. She says it was less than half an hour. Having regained pos-

102 M.—3

session of her faculties, she ran out of the house into the street. The first man she met inquired: "What is the matter with you?" She answered: "Run to the drug store, quick." When the police started upstairs with pistols drawn, she said: "Don't go up there! don't go up there!" The officers of the law entered the premises, searched the second floor and found nobody, went to the next floor, and found the deceased dead upon the floor. He was lying on his left side, with his left cheek on the floor, his left arm beneath the body, the legs bent at the knees and drawn up, and the right arm so that the hand was on his leg. Loosely gripped in his hand was the revolver, the muzzle of which projected between and below the legs, so that it was visible to one standing in the doorway. In the right side of the head was a bullet wound, about an inch and a half back of the ear. The trend of the bullet was downward and backward. Two or three cartridges remained in the revolver, which was of a .38 or a .32 caliber. Two or three empty cartridge shells had been extracted from it. Only a small amount of money and some papers were found on the person of the dead man. No one was found in the building in any wise connected with the death of the insured. The testimony of the unfortunate woman who was shot consistently maintained that deceased shot her; but she did not say that she saw the deceased shoot himself. She emphatically denied having maintained any illicit or improper relations with the deceased. There was no testimony that she called for help. She did nothing to cause the apprehension of her assailant. Her narrative as to what occurred immediately preceding the shooting varied at different times. More specifically, she told the dressmaker who occupied the first floor of the building that at the time she received the shot she was looking into a drawer in a dresser for a present of which he had told her, and that while stooping over she received the shot. This she denied in her deposition.

*Van Derlip & Lum* and *Thomas J. Graydon,* for appellant.

*Chas. G. Laybourn,* for respondent.

JAGGARD, J. (after stating the facts as above).

The first group of assignments of error is addressed to the alleged impropriety of the court in receiving evidence as to the amount the insured had shortly before his death and the amount found upon his

body after death. The basis of the objection is that the record is barren of any testimony which can directly or indirectly suggest an inference of homicide, or remotely sustain such an inference. We are of the opinion that the evidence was properly received.

It is obviously desirable in these cases, which are of necessity shrouded in more or less mystery, that liberality should be exercised by courts in the admission of evidence tending to shed light. One circumstance naturally and constantly considered as of this class is the pecuniary condition of the deceased. Such testimony is directly relevant on the subject of his motive. In Furbush v. Maryland, 133 Mich. 479, 95 N. W. 551, the defendant contended that deceased had committed suicide. A revolver was found near his hand; a watch and chain and small amount of silver in his clothes. The court held that the question was for the jury, and, inter alia, said of the previous appeal (131 Mich. 234, 91 N. W. 135, 100 Am. St. 582): "Upon the first trial the defendant sought to show the insured was in straitened pecuniary circumstances and was of intemperate habits. This testimony was, we thought, improperly excluded, and for these reasons the judgment was set aside and a new trial ordered." If it be reasonable for a defendant to show financial embarrassment to confirm its theory of self-destruction, it is reasonable for the plaintiff to show the opposite condition to disprove the theory of suicide. In many cases it has been received and considered by the courts. See Fidelity & Casualty Co. v. Freeman, 109 Fed. 847, 48 C. C. A. 692, 54 L. R. A. 680; Cox v. Royal Tribe, 42 Ore. 365, 60 L. R. A. 620, 71 Pac. 73, 95 Am. St. 752; Carpenter v. Supreme Council, 79 Mo. App. 597.

The second group of assignments of error concerns the alleged error of the trial court in receiving in evidence the photograph of the rear of the premises, showing, inter alia, a stairway from the second floor to the ground. The basis of the objection is that its reception simply served to emphasize in the minds of the jury the gauzy suggestions of robbery as a motive for the unproved and otherwise unimaginable murder, by showing a possible mode of escape for the murderer from the premises. It is obvious that any testimony showing the condition of the premises and of means of access to and egress from the place where the deceased died was relevant. The court was not bound, at

the time this was introduced, to determine whether proof tending to show some other cause of death than suicide was gauzy or not. Apart, however, from the time at which the objection was made, we think the evidence was properly admitted, in view of the burden of proof, as will hereafter be set forth.

The third group of assignments of error presents for review the merits of the controversy. The defendant insists that the testimony demonstrates that this was a case of suicide—pure and simple. The law on this subject is well settled. There is little controversy as to its formula and a singular unanimity in its application. Many cases have been cited and analyzed by both counsel. Their discussion here would serve no useful purpose. See also 28 Cent. Dig. Insurance, §§ 1663, 1720. That insurance companies rarely succeed in sustaining this defense is, in its proper sense, no criticism upon the law or the rules laid down by the courts. The difficulty is inherent in the subject-matter. Men do not ordinarily commit suicide, and when they do they seek conditions of secrecy. Proof of death by suicide is naturally hard to be had. In Lindahl v. Supreme Court I. O. F., 100 Minn. 87, 110 N. W. 358, Mr. Justice Elliott has thus summarized the rules generally accepted on this subject:

Where the defense of suicide is asserted against an action by a beneficiary on an insurance policy "(a) the burden of proving that the deceased committed suicide is upon the defendant; (b) the presumption is against suicide; (c) if the known facts are consistent with the theory of natural or accidental death, the presumption which the law raises from the ordinary motives and principles of human conduct requires a finding against suicide; (d) when circumstantial evidence is relied on, the defendant must establish facts which exclude any reasonable hypothesis of natural or accidental death."

It is the defendant who must, when circumstantial evidence is relied upon, establish such facts as preclude the hypothesis of natural, violent, or accidental death. The burden of proof does not rest on the plaintiff to establish such facts as demonstrate or justify the theory of death otherwise than by the hand of the insured himself, in order that the jury may find against death by suicide. It is not material that "there was not enough evidence to say that murder was done."

O'Rear, J., in Ætna v. Milward, 118 Ky. 716, 82 S. W. 364, 365 (and see cases collected at page 366), 68 L. R. A. 285.   Moreover, where the cause of death is in doubt, there is a presumption of law against death by suicide.   It is true that there is a corresponding presumption against death by crime.   The result of the rule in such a case as this is, as has been well said by Cassoday, C. J., in Rohloff v. Aid Assn. (Wis.) 109 N. W. 989, 991: "Can it be said as a matter of law that the inferences or conclusions to be drawn from such facts are so clear and unambiguous that reasonable men, unaffected by bias or prejudice, would agree that the deceased intentionally shot himself?"   It is to be noted that this case was decided subsequently to Agen v. Metropolitan, 105 Wis. 217, 80 N. W. 1020, 76 Am. St. 905, to which defendant refers us.   In Hardinger v. Modern Brotherhood of America (Neb.) 103 N. W. 74, on which defendant also relies, Barnes, J., said: "The rule is well established that if, from the undisputed facts, different minds may not honestly reach different conclusions without reasoning irrationally, it is not error for the trial court to withdraw the case from the consideration of the jury and direct a verdict consistent with the facts.   *  *  *  In this case different minds cannot arrive at different conclusions."   The defendant also calls our attention to Supreme Tent K. M. v. King, 142 Fed. 678, 73 C. C. A. 349.   The rule of that case was: "Whatever presumptions exist that an insured did not commit suicide may be overcome, not only by oral testimony, but by reasonable deductions or inferences from the facts established; and where such inferences lead irresistibly to the conclusion that the case was one of suicide, the court is justified in withdrawing the question from the jury."   In Pythias Knights Supreme Lodge v. Beck, 181 U. S. 49, 21 Sup. Ct. 532, 45 L. Ed. 741, the court, by Mr. Justice Brewer, refused to set aside the verdict for the beneficiary in a life insurance policy because: "Whether the deceased committed suicide was a question of fact, and the jury is the proper trier of such questions. It is not absolutely certain that the deceased committed suicide."   See also National v. Thomas, 10 App. Div. D. C. 277; Home Benefit Assn. v. Sargent, 142 U. S. 691, 697, 700, 12 Sup. Ct. 332, 35 L. Ed. 1160.

After a careful consideration of the record, we have concluded that the trial court did not commit reversible error in refusing to set aside the finding of the jury. The evidence tending to show suicide, while circumstantial, is undeniably strong; but we do not think it is of so conclusive a character that reasonable men might not hold the opinion that the deceased did not die by his own hand. Plaintiff has argued with much earnestness against the theory of suicide from the place at which the bullet entered the head of the insured, from its course therein, and from the physical condition of the head about the aperture. We do not find much force in this contention. There is, however, substance to his insistence that no motive, adequate or inadequate, for self-destruction, was shown by the evidence. The deceased was in comfortable pecuniary circumstances, lived happily with his family, and was not shown to have sustained any illicit or improper relations with the woman he is claimed to have shot. No cause for suicide is to be found in his temperament. He was a normal, cheerful, and energetic man. The theory of suicide might fairly be regarded as tenable only if it be assumed that the deceased was insane at the time of his double crime. There is no evidence to support this. It rests upon pure conjecture. To the absence of adequate motive the courts have always attached the highest importance in this class of cases. In Modern Woodmen v. Kozak, 63 Neb. 146, 88 N. W. 248, the court said: "But there is another fact of which the jury could not have been ignorant, namely, the absence from the record of all evidence tending to show a motive inciting to self-destruction. Self-murder is abhorrent to the mind, and common observation teaches that normal men are not driven to the desperation of suicide without some exciting cause of more than ordinary magnitude. Kozak is shown by the record to have been healthful and prosperous, and the record contains no hint to furnish a motive for seeking his own end. In view of this fact, and in the absence of some uncontradicted evidence from which no other conclusion than that of suicide could be drawn by reasonable men, it is impossible to say that the verdict of the jury is clearly and unmistakably wrong." And see Ætna v. Milward, supra.

The theory of suicide rests upon two principal items of proof. The first of these is the fact that the revolver was found loosely gripped in the dead man's hand. In the nature of things, this circumstance is by no means conclusive. Nothing is more common in the history of crime than to place the means of death near or in the hands of the victim. The revolver was not shown to have belonged to the deceased, nor to have been formerly in his possession. In many reported cases in which the insurance companies have sought to avoid liability on the theory of suicide, the presence of a pistol, in connection with other circumstances, has been held by the courts not to sustain the defense. The fact that the pistol was found in the hand of deceased is not conclusive. In Leman v. Manhattan, 46 La. An. 1189, 15 South. 388, 24 L. R. A. 589, 49 Am. St. 348, a man without physical or mental disturbance or financial or family trouble and in good spirits was found dead, with a pistol wedged in the bed of his thumb. The verdict for the beneficiary was sustained. In Travelers v. Nitterhouse, 11 Ind. App. 155, 38 N. E. 1110, the beneficiary recovered, although the deceased was found with a bullet hole near the center of his forehead, and with a self-cocking revolver in his right hand—the last three fingers resting on the handle, the index finger on the trigger, and the thumb just back of the hammer. In very many other cases beneficiaries recovered, notwithstanding the presence of the revolver in the immediate vicinity of the deceased. What the court said in Ætna v. Milward, supra, is peculiarly applicable here: "The surrounding circumstances are not in harmony with the view that the insured took his own life. They tend to show that the act was not the probable course of a sane person who was bent upon destroying his own life. There was no hint in the evidence showing any symptom of insanity. * * * The jury were authorized to apply to the facts detailed their knowledge of human nature, and to indulge in aid of deduction predicated upon the established facts, those presumptions which common experience has established, and which, therefore, the law allows. The love of life is instinctive. Self-preservation is its first, as it is its strongest, law. In the absence of mental derangement, of any known fact calculated to unseat the judgment and to overcome the love of life, the in-

quiring mind naturally and properly looks for other causes of the deed when death by violence occurs. When all the facts are inconsistent with the theory of suicide, except simply that of the dead body in the presence of its instrument, it would be unnatural and illogical to confine the inquiry to that incident and declare the death suicide." And see Shotliff v. Modern Woodmen, 100 Mo. App. 138, 73 S. W. 326.

The second item of proof upon which the defense rests is the testimony of the woman who was shot. If it were not for that testimony, there can be no doubt that the verdict of the jury must be sustained. The issues in the case narrow down, then, to the question whether the verdict of the jury was justified in view of that testimony. The defendant contends that the testimony of this woman could not properly have been disregarded, or rejected as not true. 3 Jones, Ev. § 904; Second National Bank v. Donald, 56 Minn. 491, 58 N. W. 269. Three considerations lead to the conclusion that the jury in this case might have been justified in so doing.

The first of these considerations is the conspicuous incompleteness of her narrative. It is plain that she omitted one page of the history of this tragedy. That page contained the whole story. If it were in the record, it might show the relations between the deceased and the woman who was shot to have been such as to supply in his jealous rage the motive of his double crime. It might show the bloody revenge of an escaped murderer, now protected by her silence, who, finding her in a room with an actual or supposed lover, undertook to kill both. It might show an attempt by deceased to kill the woman in the act of robbery, and his murder by her accomplice. It might show a number of other hypotheses suggested; or, what is likely, it might show a state of facts not now imagined. Was the jury bound to invent an adequate hypothesis? Was it bound to accept her statement as containing the whole truth? We think it was not bound to do either. A second of these considerations is that the woman's testimony was impeached. The presence of the plaintiff's husband and the woman who was shot in a room on the premises which she had rented from the owner is a most significant fact. Her explanation consistently accounts for it. It was, however, the duty

of the jury to consider the truth of her testimony on this point, in connection with testimony that the deceased had been living happily at home during the whole period, and that the witness had seen the plaintiff's wife in Minneapolis at the time when, according to her statement of what he said, his family was in California. The testimony of the witness as to her position at the time she was shot was flatly contradicted by her own previous statements made to a disinterested witness. A third consideration diminishing the force to be given the testimony of this witness is the argumentativeness of her answers and her conduct after the tragedy.

Construing the testimony as a whole, including that of this woman, the finding of the pistol, and all the physical facts together, in view of the considerations which have been referred to, and others which it is not necessary to enlarge upon, we think that the jury was justified in rejecting the defense. The trial court properly refused to disturb its verdict.

The other assignments of error have been examined and found to be without merit. They call for no discussion.

Order affirmed.