BERTHA ZEARFOSS v. SWITCHMEN'S UNION OF NORTH AMERICA.[1]

July 19, 1907.

Nos. 15,200—(181).

**Life Insurance—Suicide.**

One who intentionally takes his own life by administering to himself a poisonous drug, being of sufficient mental capacity to comprehend the nature and consequences of the act, commits deliberate suicide.

**Evidence.**

The evidence does not purport the finding of the jury that the deceased met his death from some cause other than deliberate suicide.

Action in the district court for Carlton county to recover upon a life insurance policy. The case was tried before Dibell, J., and a jury which rendered a verdict for $1,241 in favor of plaintiff. From an order denying a motion for judgment notwithstanding the verdict or for a new trial, defendant appealed. Reversed.

[1] Reported in 112 N. W. 1044.

Leo A. Ball and Ross & Dwyer, for appellant.

Reynolds & McClearn and W. P. Crawford, for respondent.

LEWIS, J.

Samuel Zearfoss, respondent's husband, during his lifetime held a policy of $1,200 in appellant corporation which contained the following stipulation: "No claim shall be paid where death or disability is in consequence of the following causes: * * * Deliberate suicide." Respondent having recovered a verdict for the full amount of the policy, appeal was taken from the order denying appellant's motion for judgment notwithstanding the verdict or for a new trial.

Zearfoss was a man forty six years old, residing at Superior, Wisconsin, with his family, which consisted of himself and wife, a son, and married daughter. About seven o'clock in the evening of Tuesday, January 23, 1906, he was found dead in a bedroom of a lodging house kept by a Mr. and Mrs. William Fischer. The evidence will have to be examined with care to determine whether it was sufficient to justify the jury in concluding that the insured did not commit deliberate suicide. Although Zearfoss was in the habit of taking intoxicating liquors, he did not drink to excess, except about once a month, when he would go off on a spree. So far as the record disclosed, there was no family trouble which would tend to influence him to take his life. He had been in the employ of the Lake Superior Terminal & Transfer Railway Company as a switchman during December, 1905, and on January 16, 1906, was paid for December's work the sum of $58.18, at which time he stopped working, and four days thereafter, on January 20, went to the switching foreman and asked for his time, and was given an order on one of the officers of the transfer company, and received $40.60 for the time he had worked in January. He left his home about two o'clock in the afternoon of January 19, and never returned. On the 22d, about eight o'clock in the evening, he telephoned his wife that he would be home at ten o'clock the following morning, but refused to tell where he was. The Fischer lodging house was located at the corner of Seventh street and Tower avenue in Superior, a two-story frame building, the lower floor of which was occupied as a saloon by one Ed Larson, and the

upper floor was the rooming house, and was about a five-minute walk from the Zearfoss residence.

Fischer testified that some time after twelve o'clock Monday morning, January 22, Zearfoss came to his place and asked for a room; that he was shown one, and paid the fifty cents charge in advance; that he then asked Fischer to go downstairs and have a drink, and after some talk they went downstairs, where they remained drinking and playing cards with the saloon keeper, Larson, and the negro porter, until about two o'clock in the morning, when Fischer left them and went to his room, but Zearfoss remained until about five o'clock in the morning, when he went to his room; that while talking over their drinks that night Fischer asked Zearfoss why he was not at home, and he answered, "Little trouble in the family," and, as Fischer was about to go upstairs, Zearfoss ordered a bottle of beer, and Fischer asked what he was going to do with it, to which Zearfoss replied, "Never mind, Fischer; it might be the last." Fischer did not see him again until he found him dead in bed. Mrs. Fischer testified that somewhere about five o'clock Monday morning Zearfoss came to her room, and stayed there until about three o'clock in the afternoon; that on Tuesday morning, between four and five o'clock, he came to her room again, and asked if he could be accommodated with a bed; that she assigned him to room No. 6, for which he paid her fifty cents; that to her knowledge he did not leave the room during the day, and she did not see him again until after his death. It does not appear that any one saw him on Tuesday except one Frank Miller, who had occupied the room given to Zearfoss, and whose personal belongings were still in the room. According to his testimony about three o'clock in the afternoon of that day he asked Mrs. Fischer if he might go to the room and get some things out of his trunk; that he found the door locked; that he knocked, and Zearfoss opened it; that Zearfoss asked him to get a drink of beer for him, and after searching his pockets for money found two nickels, which he handed Miller, who took the money, borrowed a pitcher from Mrs. Fischer, went downstairs, threw the two nickels on the counter, and the bartender filled the pitcher, and handed him back a nickel, which Miller returned to Zearfoss, and gave him the pitcher of beer; that, while he (Miller) was getting his clothes, Zearfoss took the pitcher,

sat down on the bed, and began to drink out of the pitcher, and appeared to empty it; that as Miller was about to leave the room, about four o'clock, Zearfoss said, "Don't say anything to anybody that I am here;" also: "I have got to go over and see somebody at the Terminal—at headquarters over there at the Terminal. * * * I want to see some foreman there. * * * I am going to work tomorrow morning." Miller testified that he saw no glass in the room.

Fischer went to Zearfoss' room about seven o'clock Tuesday evening for the purpose of waking him, and found the door open and Zearfoss lying dead in the bed, dressed in his underclothes, and partially covered with the bed clothes. Fischer immediately notified police headquarters, and Detective Dill arrived and was the first person, besides Fischer, to enter and examine the room, and he testified that he found the body lying naturally—one arm straight by his side, and the other partially on his body; that his clothing, except what he had on, was at the foot of the bed, with the exception of his coat, which hung on a hook behind the door; that he made a search of the clothing, and found only a watch and a nickel; that on the washstand he found a bottle of carbolic acid, a small beer glass, and a pitcher with a little beer in it, to which he touched his tongue and found it tasted and smelled like carbolic acid; that he could not definitely recall whether the pitcher was of earthenware or glass, but thought it held about a quart; that he could not remember whether the carbolic acid bottle had a stopper in it or not, but knew the liquid was white; that after removing the body he made a further search of the room, but did not find anything more, but testified that Fischer showed him an ordinary whiskey glass, which he told him he found between the pillow and quilt in the bed. The coroner testified that, upon being notified of the death of Zearfoss, he visited the room Tuesday evening; that he saw the pitcher and a beer glass, or cup, and a bottle of carbolic acid partly full; that he took possession of the bottle, and retained it until the time of the trial; that there was a strong odor of carbolic acid in the room, and that the pitcher and beer glass had a very strong smell of the acid; that he was under the impression that there was no bedclothing in the room when he was there. Rydell, the proprietor of the Red Cross Drug Store, across the street from the lodging house, testified and identified the carbolic acid bottle

by the label which had the name of the store; said that he sold such a bottle of carbolic acid on Monday to a man who said his name was Murphy, and, being questioned as to the identity of the man who bought the acid and the deceased, said, when he had observed the body at the undertaker's:

> Well, my judgment then was that there was not much doubt in my mind but what it was the same man.  Q. State whether or not there is any doubt in your mind at the present time but what it was the same man.  A. No, there is no reasonable doubt.  There might be some; but, as I said before, I can't swear absolutely.  Well, my best judgment is I think it was the same man.

A newspaper reporter, Collins, stated he was in the Larson saloon between one and two o'clock Tuesday morning and saw Zearfoss pull a roll of bills from his pocket.  Collins also testified that he visited the room with Coroner Dudley and Detective Dill, and that he noticed a pitcher and basin in the room, and a small pitcher and water glass on the washstand, and that there was a little beer in the pitcher— probably about half an inch—and that it smelled of carbolic acid, as did also the glass.  The saloon keeper, Larson, testified that the last drink or so which Zearfoss took at his place early Tuesday morning was not paid for, because Zearfoss had no money; that he was free with his money as long as it lasted, buying drinks for everybody as well as for himself, and playing cards with different people for the drinks.  The post mortem examination showed that Zearfoss died from the effects of carbolic acid poison; but the surgeons testified that there were no burns apparent in the mouth or on the visible part of the tongue, and none on the fingers.

The general principles applicable in this class of cases have been stated and applied in several instances by this court, and recently in Lindahl v. Supreme Court I. O. F., 100 Minn. 87, 110 N. W. 358, and Kornig v. Western Life Indemnity Co., supra, p. 31, 112 N. W. 1039:  Where death appears, the law presumes that it results from causes which were not voluntarily brought about by the deceased, and the company is required to prove that the deceased committed suicide.  If the evidence in a given case is consistent with the theory of suicide, or with

death by some other means, then the presumption that death was not caused by suicide requires a finding against suicide. The burden being thus upon the company to establish proof of cause, it is required to eliminate and disprove all other causes of death consistent with the evidence. "But the ultimate fact is required to be proven by a preponderance of evidence only, and this rule is in no way affected by the subsidiary requirement that the defendant must by its evidence exclude every other reasonable theory for accounting for the death." That the deceased came to his death by means of poison is established beyond controversy. If it was not voluntarily taken by him while conscious of its nature and of the result that would follow, then it must have been taken by mistake, or administered to him by some one when he was in an intoxicated or unconscious condition, and, if the latter, then it must have been designedly for the purpose of accomplishing his death. If an examination of the evidence discloses reasonable ground for the theory that the drug might have been taken in either one of the ways suggested, and if such theory is equally consistent with that of self-destruction, then the company has failed to establish by a fair preponderance of the evidence, that he committed suicide.

Counsel for respondent suggests three different hypotheses to account for the death of this man, all of which are claimed to be inconsistent with the theory of voluntary self-destruction: First, that the deceased was in the habit of taking a drug, and that possibly, in the stupor resulting from the debauch, he may have gone into the toilet room and by mistake taken a bottle of carbolic acid without being conscious of his act; second, that, if he went to the drug store to purchase a drug, he may have asked for something else and received the acid by mistake, and that he was not in a state of mind capable of appreciating the difference; and, third, that the drug was designedly given to him by Miller, or Fischer, for the purpose of robbery, they expecting his death would be attributed to self-destruction.

The defense successfully established the fact that the three-ounce bottle of carbolic acid had been recently purchased from the Red Cross Drug Store. The bottle bore the label of that store, the liquid was white or colorless when found, showing it was a recent purchase, and it fairly appears from the evidence of Rydell, the drug store propri-

etor, that Zearfoss bought it the day preceding his death, although he gave a fictitious name. Mrs. Fischer testified that there was no carbolic acid in the washroom, or in the house, and no one else had seen any, or any such bottle in the toilet room or elsewhere, except Miller, who claimed to have seen a bottle of the same size in the toilet room; but he did not say that it bore the same label or contained carbolic acid. There is no evidence that the bottle was bought or brought to the house by any one else, and everything indicates that Zearfoss bought and brought it there himself. It is an unreasonable assumption, under the evidence, that the druggist gave carbolic acid to the purchaser by mistake, although similar mistakes do sometimes happen. The fact that Miller did not see the bottle when he was in the room Tuesday afternoon does not prove it was not there, as it might have been concealed in the bed, and Miller did not claim that he examined everything in the room with a view of determining whether such a thing was there. Miller also said he did not notice any glass in the room, and that he borrowed a pitcher from Mrs. Fischer in which to get the beer; but it does not follow that there may not have been a glass in the room which escaped his notice. So we fail to find any evidence upon which to base the hypothesis that Zearfoss took the drug by mistake for some other drug.

There is no evidence to support the suggestion that the poison might have been administered to him by either Miller or Fischer for the purpose of robbing his person. It was not shown that either of those men bought the drug, or ever had any in their possession. The only person whom the drug store proprietor attempted to identify as the purchaser was the deceased, and he described him in a general way as to appearance, stating that to the best of his judgment he was the man. Again, what object would either Miller or Fischer have in taking the man's life? It was shown with reasonable certainty that he had spent all his money with the exception of ten cents before he left the saloon early Tuesday morning, and the only incident relied upon to contradict this is the testimony of the reporter Collins, that he saw Zearfoss take a roll of bills out of his pocket, but he did not state the number or denomination of the bills, and it may have amounted to no more than a few dollars, which he might easily have spent in gambling and buying drinks before he left the saloon that morning.

There is no other suggestion of a purpose by either Miller or Fischer for taking the life of Zearfoss, except to get his money, and murder under such circumstances is a violent presumption, not to be indulged in, and is contrary to all the evidence in the case. That the deceased's mouth and tongue did not show visible signs of burning from the acid is not important. He swallowed enough, either clear or diluted with beer, to cause his death, and there is no indication that the poison was taken by mistake, or that it was administered to him by some one else. Miller said that Zearfoss appeared to drink all of the beer in the pitcher; but he did not look into it to see if he did so, and Zearfoss may have taken only a portion of the beer, and put the acid into the remainder after Miller went away, or he may have taken the poison in some other manner. The mere fact that there were no burns in the mouth from the acid does not warrant the conclusion that some one brought more beer after Miller had gone, mixed the carbolic acid with it, and gave it to Zearfoss.

We have examined all the cases cited by respondent. The more important are: Sartell v. Royal Neighbors of America, 85 Minn. 369, 88 N. W. 985, which is easily distinguished; Stephenson v. Bankers, 108 Iowa, 637, 79 N. W. 459; Modern Woodmen v. Kozak, 63 Neb. 146, 88 N. W. 248; Agen v. Metropolitan, 105 Wis. 217, 80 N. W. 1020, 76 Am. St. 905, decided by a divided court. Each case stands upon its own peculiar facts, and no one is exactly in point. That Zearfoss administered the drug to himself without the intervention of any one else was established by the great preponderance of the evidence, and the only question which really merits discussion in this case is whether or not he was conscious of the act and did so for the purpose of taking his life.

It is claimed that, the word "deliberate" having been introduced by appellant, the policy should be strictly construed against it. We are not aware that this term has been used in any of the policies of this character heretofore under consideration by the courts. In the case of Life Ins. Co. v. Terry, 15 Wall. 580, 21 L. Ed. 236, the policy contained the provision that it should be void if the assured shall "die by his own hand." The court used this language with reference to suicide: "If the death is caused by the voluntary act of the assured, he knowing and intending that his death shall be the result of his act,

but when his reasoning faculties are so far impaired that he is not able to understand the moral character, the general nature, consequences, and effect, of the act he is about to commit, or when he is impelled thereto by an insane impulse, which he has not the power to resist, such death is not within the contemplation of the parties to the contract, and the insurer is liable. * * * If the assured, being in the possession of his ordinary reasoning faculties, from anger, pride, jealousy, or a desire to escape from the ills of life, intentionally takes his own life, the proviso attaches, and there can be no recovery."

In the case of American v. Isett's Administrator, 74 Pa. St. 176, a similar provision was under consideration, and, the defense being that the deceased was insane, the court stated the rule as follows: "If, at the time the pistol was fired, Isett was conscious of the act he was committing, and intended to take his life, and had sufficient mental capacity to comprehend and understand the nature and consequences of his act, then the defendants are not liable. If, on the other hand, he was not thus conscious, but acted under an insane impulse or delusion sufficient to impair his understanding or will, or if his reasoning power was so far overthrown by his mental condition that he was incapable of exercising his judgment in regard to the consequences, then the defendants are liable."

In Equitable v. Paterson, 41 Ga. 338, 5 Am. 535, the provision in the policy was that it should be void if the assured should die by his own hand within two years from the date of the policy. The court said: "An accident, even though it be the result of that loss of perception produced by drink, cannot fairly be called the product of intent. But, if the intent in fact exists, the other fact that the man was maudlin from drink, and could have no very intelligent conception of his surroundings, does not help the case, since the drunkenness is his own act, and society would be in great danger if one could escape the consequences of his acts by the plea of drunkenness."

In Union v. Hollowell, 14 Ind. App. 611, 43 N. E. 277, the provision in the policy was: "Self-destruction by the insured, whether sane or insane, within three years from the date hereof, will avoid this policy." The court instructed the jury that, "if Koehler died from arsenic poison, such fact would not be sufficient to defeat the

policy, unless you also find, from all the evidence in this case, by a fair preponderance, that said poison was deliberately and wilfully taken by said Koehler, with the intent to commit suicide." The appellate court held this to be error, for the reason that it was not incumbent upon the company to prove that the act of self-destruction was carefully considered, and held the true rule to be that "the conscious and voluntary act on the part of the assured in taking the poison with intent to take his own life, which resulted in death, was sufficient to defeat the claim of insurance, whether such act was committed deliberately or not." In that case the term "deliberate" was not used in the policy; but the most that can be claimed for the term is that it should clearly appear that the deceased intentionally took the poison for the purpose of self-destruction. The word "deliberate" accomplishes no more than to eliminate the idea of having acted hastily, under an impulse of passion, or while in a condition to be deprived of the reasoning faculties. In Union v. Hollowell, supra, the court made a distinction between an act committed hastily, on the impulse of the moment, and a deliberate act with intent to commit suicide.

We shall give respondent the full benefit of this distinction; but from all of the evidence there is no foundation for the assertion that Zearfoss took his life while in a momentary fit of passion, or hastily by mistake, supposing the drug to be something else. The evidence fairly shows that he had possessed himself of the poison the day before, and had concealed it, and while he had been on a spree for several days, spending a considerable amount of money, it was shown that at three o'clock on the afternoon of his death he was roused from his sleep by a knock at his door, got up, and unlocked and opened it. Miller testified that Zearfoss seemed rational to him, although, of course, he showed the effects of drink. The defense has made out a case which would justify a jury in finding, by a fair preponderance of the evidence, that the assured deliberately took his own life; and we are forced to hold that the verdict of the jury was unsupported by the evidence. We do not consider this a case which warrants us in granting the motion for judgment for appellant notwithstanding the verdict.

Reversed and new trial granted.