## SADIE HUESTIS v. AETNA LIFE INSURANCE COMPANY.[1]

December 24, 1915.

Nos. 19,505—(150).

**Insurance — death from accidental means — evidence.**
1. The evidence sustains the verdict to the effect that an accident insurance policy was in force, when the insured died, and that his death was through accidental means.

**Admission of evidence.**
2. No rulings upon the reception of evidence reveal prejudicial error.

Action in the district court for Otter Tail county to recover $5,400 upon defendant's policy of accident insurance. The answer among other matters alleged that the insured had not paid any premiums since April 1, 1913; that he came to his death by wilful and voluntary self-inflicted injuries and that his death was due to wilful and voluntary suicide which was not covered by the policy and specifically exempted from in the provisions thereof. The case was tried before Roesser, J., who at the close of the testimony denied defendant's motion for a dismissal of the action, and a jury which returned a verdict for the amount demand-

1 Reported in 155 N. W. 643.

ed.   From an order denying its motion for judgment notwithstanding the verdict or for a new trial, defendant appealed.   Affirmed.

*Anton B. Thompson* and *James A. Brown,* for appellant.

*N. F. Field* and *M. J. Daly,* for respondent.

HOLT, J.

The action is upon an accident insurance policy, renewable from time to time upon payment of a stipulated quarterly premium.   The defense was that, for nonpayment of the premium, the policy was not in force when the insured was killed, and that the insured did not die an accidental death, but committed suicide, which is not covered by the policy.   Verdict for plaintiff, and defendant appeals from the order denying its alternative motion for judgment or a new trial.

Hilton & Thompson were defendant's agents at Fergus Falls.   Quarterly, and a week or ten days before the date on which any accident policy would expire unless a renewal premium was paid, defendant would forward to Hilton & Thompson a receipt for such premium, signed by its president, to be countersigned by the agents and delivered to the policyholder when paid.   Hilton & Thompson would at once countersign and mail the receipts, before the premium came due, to those policyholders whom they trusted. Afterwards they would collect.   The agents accounted to defendant every month by forwarding the cash for the amount represented by the receipts sent them by the company and which they had countersigned and delivered to the policyholders.   Those not countersigned and delivered—that is not collected—were returned.   In this particular instance Hilton & Thompson had remitted for all the premiums due upon the policy so that it was in force, and had delivered to the insured the receipts, properly countersigned by them.   However, the insured had not paid Hilton & Thompson for the last four quarterly premiums remitted to defendant.   In other words, the agents had advanced and paid to defendant, out of their own funds, the renewal premiums on this policy and had charged the amounts thereof on their books to the insured.   The defendant had received and accepted the stipulated premiums.   Where the money came from is no concern of defendant.   No question of waiver by agent is involved.   The defendant received the premium in proper time.   We think a bare statement of

the undisputed facts leads to but one conclusion, namely, the policy was in force when the accident befell the insured. Fidelity & Casualty Co. v. Willey, 80 Fed. 497, 25 C.C.A. 593. An attempt is made in the brief to challenge the court's instruction upon this subject; but no exception was taken to the charge when given, and no error was assigned thereon in the motion for a new trial, nor in this court. We therefore cannot consider the matter. We may say the instruction accorded with the opinion in the case above cited.

The insured, Mr. Huestis, was killed by the discharge of a shotgun. The court instructed, in conformity to the terms of the policy, that the burden was upon plaintiff to prove that death was accidental, and also that it was not incumbent on defendant to establish that Huestis committed suicide. The charge was acceptable to both parties and was in line with these cases cited by defendant: Whitlatch v. Fidelity & Casualty Co. 149 N. Y. 45, 43 N. E. 405; Laessig v. Travelers' Protective Assn. 169 Mo. 272, 69 S. W. 469; Fidelity & Casualty Co. v. Weise, 182 Ill. 496, 55 N. E. 540. The policy insured Huestis "against liability or death resulting directly and independently of all other causes from bodily injuries effected solely through external, violent and accidental means, suicide (sane or insane) not included." The charge being correct, we can only inquire whether the proof fairly supports the verdict to the effect that the death of the insured was accidental. The defendant contends that not only has plaintiff failed to sustain the burden of proof, but that the insured appears conclusively a suicide. In this we think the record does not sustain defendant. The substantially undisputed facts are these: Mr. Huestis was a barber, 50 years of age, living with his wife and two grown daughters, the one daughter having been married a few months before the accident and, with her husband, temporarily residing at the home of her parents. He was devoted to his wife and children, generally spending his time with the family when not at work. His habits were excellent; his health good; his disposition genial, and he enjoyed the favor and esteem of his fellows. He had always made a good living, and for some time before his death was in partnership with another person, conducting a barber shop with apparently satisfactory results. He had not accumulated any property outside of household goods and his share of the

furnishings of the shop, about $300 in value.  It appears inferentially that some years earlier he owned a home in Fergus Falls, but that at the time of his death he lived in a rented house.  There is no showing that he had met with losses, or financial reverses, or had any troubles whatsoever.  In the circumstances and conditions under which Mr. Huestis had lived, and was living, we look in vain for anything to engender suicidal desire.  Neither does his conduct immediately prior to death suggest suicide.  On April 17, 1914, he worked as usual in the shop, and appeared to his partner, to his family, and to others to be in his customary cheerful mood.  He closed the shop about 8:30 in the evening and went home.  For some little time he had been selling tickets to raffle off his double barreled shotgun.  He wanted a lighter gun.  Someone at the shop had suggested that he could dispose of the tickets more readily if he kept the gun at the shop.  He had it at home, hanging in a case on the wall of the bathroom.  When he came home his son-in-law asked how the ticket sale was going and the response was that the raffle would surely take place.  The evening in question was the one upon which he generally took a bath.  When he came home he spoke to members of the family, then went upstairs to his bed-room and took out and placed on the bed a suit of clean underwear.  Within a few minutes he was seen coming down stairs, without coat and hat, and with a night shirt over his arm; went into the bath room, which was down stairs, and hung the night shirt on a hook; then came directly out, passing through the sitting room where were some members of the family, and went into the kitchen; felt of the tank supplying the hot water for the bath tub; returned to the bath room and closed the door, and turned on the water.  In a few moments a dull thud was heard.  The bath room door was pushed open, and Mr. Huestis was dead.  He had fallen so as to partially obstruct the door.  The gun lay partly under him, the muzzle pointing toward the feet.  The charge had passed into the skull back of and about one inch above the ear, practically blowing off the top of the skull.  The evidence showed that deceased owned a revolver which he kept upstairs in a bureau drawer.  It also appears that the automatic safety device on the lock of the shotgun, a hammerless, was defective.  One of plaintiff's witnesses stated that in handling it both locks snapped, when sup-

posed to be at safety, by a mere touch of one of the triggers, or by a slight jar, and a gunsmith, testifying for defendant, conceded the defect in the safety device, but thought that would prevent the gun being fired. With these facts, and the presumption against suicide, we think the jury were amply justified in finding that a fair preponderance of the evidence pointed to accidental and not intentional death. The facts speaking for accidental death are much stronger in the case at bar than in Kornig v. Western Life Indemnity Co. 102 Minn. 31, 112 N. W. 1039, and Peterson v. Prudential Ins. Co. 115 Minn. 232, 233, 132 N. W. 277.

Error is assigned upon the reception of testimony showing that deceased had a revolver in his bed room. It was rightly admitted as bearing upon suicidal intent. It is a plausible inference that if deceased intended to take his life he would employ the instrumentality most readily adapted to accomplish his purpose. To support the 11-pound double-barreled shotgun so as to cause such a wound, at the place where it did hit, would be exceedingly awkward and not likely to be attempted when he possessed such a convenient weapon to use as the revolver, if he desired to take his life.

The gun went off when close to the place of the wound, for the hair was singed around the edges. How close might have some bearing on the probability of its being fired intentionally. The court permitted the result of experiments with the same gun loaded with similar shells fired into sheets of cotton wadding to be testified to. Such matters are largely within the sound discretion of the trial judge. The evidence was of very little value to either side and no prejudice could have resulted from its reception.

Order affirmed.