GENEVIEVE E. FARRAR v. LOCOMOTIVE ENGINEERS

MUTUAL LIFE AND ACCIDENT INSURANCE ASSOCIATION.[1]

July 25, 1919.

No. 21,385.

**Insurance — presumption against suicide.**

1. If the evidence in an action on a policy of accident insurance is consistent with the theory of accidental death, the presumption which the law raises from the ordinary motives and principles of human conduct, requires a finding against suicide.

**Same — death caused by accident — burden of proof.**

2. When, by the terms of such policy, there can be no recovery in case of death, unless death was caused by accidental means, the burden of proving that it was so caused rests on the plaintiff.

**Same — evidence made question for the jury.**

3. Evidence considered and *held* within the rules above stated to be of such nature that reasonable minds might properly reach different conclusions as to the inferences fairly deducible therefrom, and that the trial court did not err in permitting a verdict of accidental death to stand.

**Same — declarations of decedent admissible.**

4. It was within the discretion of the trial court to receive testimony that the insured had expressed the belief that it was wrong to commit suicide, without specifically limiting the proof to declarations made immediately preceding the date of his death.

**Rulings on evidence — charge to jury.**

5. There were no prejudicial errors in the rulings on the admission of evidence or in the instructions to the jury.

Action in the district court for St. Louis county to recover $2,000 upon defendant's accident indemnity policy. The answer alleged that the death of the insured was caused by suicide. The case was tried before Dancer, J., who when plaintiff rested denied defendant's motion

[1] Reported in 173 N. W. 705.

to dismiss the action and at the close of the testimony denied plaintiff's and defendant's motions for directed verdicts, and a jury which returned a verdict in favor of plaintiff. From an order denying its motion for judgment notwithstanding the verdict or for a new trial, defendant appealed. Affirmed.

*Warner E. Whipple* and *Frank E. Randall,* for appellant.

*I. K. Lewis,* for respondent.

LEES, C.

Plaintiff is the widow of Arthur C. Farrar. She brought this action to recover on an indemnity accident policy, issued to him by defendant, in which she was named as beneficiary. She had a verdict, and defendant appeals from an order denying its motion in the alternative for judgment notwithstanding the verdict or for a new trial.

The policy provided for the payment of $2,000 to plaintiff, if her husband's death should be caused by accident.

The complaint alleged that on the twenty-seventh day of January, 1916, the insured met with an accidental injury which contributed to and caused his death by accident on the twenty-sixth day of October, 1917. The answer denies that any accident which the insured met with on January 27, 1916, contributed to or caused his subsequent death, and alleges that the insured committed suicide. This allegation was put in issue by the reply.

1. The principal controversy centers around one issue of fact, plaintiff contending that the evidence justified a jury in finding that her husband's death was due to accident, and defendant contending that it conclusively appears that he committed suicide. The evidence has been exhaustively reviewed in the briefs and was discussed in the oral arguments with animation and thoroughness. We make no extended statement of it, but only refer to its salient features.

Mr. Farrar was a locomotive engineer employed by the Northern Pacific Railway Company for many years, and long a resident of Duluth. He and his wife were congenial; his financial circumstances were comfortable; he had no trouble or anxieties with one exception hereafter stated. He was 54 years old at the time of his death. On January 27,

1916, he met with an accident. While operating his engine, a collision with another engine occurred. He jumped from his cab to escape injury and was struck on the head by the journal boxes of the caboose attached to his engine. There was evidence tending to show that he never recovered from the effects of this injury, and his subsequent history indicates that his brain was affected. He was taken to a hospital immediately after the accident and received treatment there for a considerable time. He was restless and talkative, though normally a calm, reserved man. He complained that his head felt numb, and fainted twice. He recovered sufficiently to go to Omaha with his wife to visit his brother who was seriously ill. On the trip he talked with and introduced strangers to his wife. After his arrival he spent nearly all his time away from his brother whom he knew was in his last illness. Before he was injured he and his wife had planned a long trip, which they took shortly after his brother's death. It occupied several months and covered a large portion of the United States, with an excursion to Cuba and the Panama Canal. His conduct on the trip was unusual and indicative of mental disturbance. He had lapses of memory, which became more frequent after his return from the trip. He complained about his head, saying he could not think. He would take a coal bucket and go to a shed for coal, and come back without any and ask what he had gone after. He would soap his face and forget to wash it. He forgot time; forgot his meals; forgot to put on his underwear on arising in the morning, and forgot his dinner pail and overalls when he went to work. He constantly complained of being cold and put rugs under the doors and stuffed waste he carried in his pockets into the cracks around the windows. He also stuffed rags and waste into a pipe which conducted fresh air into his house. He began to fear for his own safety and regularly locked and bolted the doors and windows in his house, though he had never done so before. At times he would whine and cry like a child. Before he was hurt he was friendly with people he knew. After returning from his trip he did not want to meet anyone, and did not want his wife to go out so people would know they were at home.

This is the picture of Mr. Farrar painted by the evidence produced

by plaintiff. If it was a true picture, the jury was clearly justified in finding that during the final months of his life he was broken mentally and incapable of forming or executing any reasonable plan of action.

The testimony introduced in defendant's behalf casts doubt upon the fidelity of the likeness drawn by plaintiff's evidence. It depicts Mr. Farrar as an eccentric man before he was hurt. It appears that on the journey already referred to he kept a diary which was put in evidence and tends to show that he intelligently observed objects of interest along the route traversed. Within a few days after his return he resumed his occupation and ran a switch engine in the railroad yards at Duluth for more than a year, without exhibiting to the men who worked with him any evidence of mental derangement or change from his former condition as they had observed it. He continued to work until a few days before his death, but did not work steadily, and would stay at home every week from two to three days, spending most of the time in bed. Great stress is laid upon the fact that he was able to run his engine successfully after he was hurt. There was medical testimony, produced by plaintiff, to the effect that after many years service an engineer does, automatically, the things his daily duties require him to do.

In our judgment, the evidence as a whole would justify a jury in finding that, up to the time of his death and as a result of the injury to his head, Mr. Farrar was steadily deteriorating both mentally and physically, and that there was a marked loss of memory causing him often to forget to finish that which he had begun to do.

For 16 years prior to his death he and his wife lived in a house without modern conveniences, where gas was not used. A coal range was kept in the kitchen, and it was in that room that he generally sat when at home. A few days before his death this house was sold, and he and his wife moved into another which was supplied with gas and other conveniences. It was heated by a furnace and there was a gas stove in the kitchen. The coal range was sold contrary to his wishes, his wife explaining to him that if the house was cold they would "use the gas" to take the chill off. The gas stove was new, had not been properly adjusted, and during the four or five days it had been in use would go

out after it was lighted and would pop and blow a match out when it was being lighted.

About 1:30 p. m. on the day of Mr. Farrar's death it became necessary for Mrs. Farrar to go to the business district of Duluth to attend to a number of errands. One was the transfer of the bank account then in Mr. Farrar's name to their joint account, so that both could check against it. Mr. Farrar had been at home since they moved into the new house, spending most of the time in bed. When his wife told him she was going out to attend to her errands, he offered to go for her, but finally decided not to do so. She returned to the house shortly after 4 p. m. Before she left she bolted the back door but left the front door unlocked. When she returned, all the doors were locked and the window shades in the kitchen were down. Being unable to get in the house, she called on a neighbor for assistance. A window was broken and the house entered. Mr. Farrar was found lying on an ironing board extending from the kitchen sink to the kitchen table. His head rested on a cushion he had placed on the ironing board and was near the oven of the gas stove. All the burners—seven or eight in number—were turned on and none were lighted. He had been overcome by the escaping gas, was unconscious, and died without regaining consciousness. Rags and pieces of carpet were stuffed about the cracks under the kitchen doors and in the flue over the gas stove. Some kitchen furniture was pushed against the doors. There was testimony that, as her husband's body was being carried out, Mrs. Farrar said: "Arthur, you said you would do it and you did do it."

If Mr. Farrar had been a man of normal mind and memory, the circumstances surrounding his death would compel the conclusion that it was due to self-destruction, but the jury could not well find that his mind was normal. The evidence which we have briefly outlined points quite conclusively to a state of mental aberration. The situation at the house at the time of his death must be viewed with that fact in mind. On the one hand, it is strenuously contended that the situation we have described points conclusively to suicide, while, on the other, it is contended that it falls short of overcoming the presumption against suicide and is not irreconcilable with the claim of death by accident.

In weighing and considering the evidence, we have had in mind the rule that if the evidence is consistent with the theory of accidental death, the presumption which the law raises from the ordinary motives and principles of human conduct requires a finding against suicide, and the applications of the rule which this court has made in previous cases. Lindahl v. Supreme Court I. O. F. 100 Minn. 87, 110 N. W. 358, 8 L.R.A.(N.S.) 916, 117 Am. St. 666; Kornig v. Western Life Ind. Co. 102 Minn. 31, 112 N. W. 1039; Zearfoss v. Switchmen's Union of North America, 102 Minn. 56, 60, 112 N. W. 1044; Peterson v. Prudential Ins. Co. 115 Minn. 232, 132 N. W. 277; McAlpine v. Fidelity & Casualty Co. 134 Minn. 192, 158 N. W. 967; State v. District Court for St. Louis County, 138 Minn. 138, 164 N. W. 582.

We have also given weight to the fact that by the terms of the policy itself, without regard to defendant's by-laws relating to suicide, there could be no recovery, unless death was caused by accidental means, and that the burden of proving that it was so caused rests upon plaintiff. Huestis v. Aetna Life Ins. Co. 131 Minn. 461, 155 N. W. 643; McAlpine v. Fidelity & Casualty Co. supra. We have noted the absence of evidence revealing the usual motives or causes which have prompted men to commit suicide or manifesting a previous suicidal intent. We have considered Mr. Farrar's conduct prior to the day of his death; his attempts to guard against draughts in his house; his desire for warmth and habitual complaints that he was cold when others were comfortable; his unfamiliarity with gas stoves and the defective condition of the stove in his kitchen; his lapses of memory; his dislike of visitors and abnormal desire to have it appear that his house was unoccupied; and from these and other circumstances of minor importance, but all tending to support plaintiff's contention that his death was accidental, we hold that reasonable minds might properly reach different conclusions as to the inferences fairly deducible from the evidence, and that, therefore, the trial court properly permitted the verdict to stand.

It is suggested in appellant's brief, quoting Winslow, J., in Rens v. N. W. Mut. R. Assn. 100 Wis. 266, 75 N. W. 991, that such a holding

"would amount to a pitiable stultification of the reasoning powers." The case has been tried twice and we are unwilling, upon the record before us, to convict the members of the two juries who found in plaintiff's favor and the able and impartial district judges who presided at the trials of having affronted reason in passing as they did upon the vital question in the case. To hold that different minds could not reasonably come to different conclusions from the evidence and that indubitably the case is one of suicide would be to arrogate to ourselves a monopoly in the ability to reason logically and honestly, as was pointed out in Agen v. Metropolitan Life Ins. Co. 105 Wis. 217, 230, 80 N. W. 1020, 76 Am. St. 905, by the same able jurist whose remark in the Rens case is quoted for our edification.

2. Mrs. Farrar, when called in rebuttal, was asked whether her husband had ever expressed himself on the subject of suicide. Over defendant's objection, she answered: "He did not believe in that sort of thing at all." Defendant moved that the answer be stricken out. There was no ruling on the motion. Plaintiff's counsel then admonished the witness not to state her husband's belief, but to give his expressions on the subject, and she then answered, without objection, that "he often expressed himself in this way, that it was wrong for one to do that sort of thing."

The first answer should have been stricken out, but we think defendant was not prejudiced because it was not stricken, in view of the answer finally given without objection, and that under the rule stated in Hale v. Life I. & I. Co. 65 Minn. 548, 68 N. W. 182, it was within the discretion of the trial court to receive the testimony without specifically limiting it to a time immediately preceding Farrar's death.

3. We find no prejudicial error in the rulings on the admission of evidence to which exception was taken. A sufficient foundation was laid to justify the ruling that the testimony of a witness given at the first trial might be read, it appearing with reasonable certainty that she was no longer within the jurisdiction of the court.

There was no prejudicial error in the instructions given or in the refusal to give the instructions requested by defendant. We regard the

charge as a clear and fair statement of the legal principles by which the jury should be guided in weighing the evidence and returning a verdict.

The order appealed from is affirmed.