FANNIE B. SHOTLIFF, Respondent, v. MODERN WOODMEN OF AMERICA, Appellant.

St. Louis Court of Appeals, March 17, 1903.

1. **Fraternal Beneficiary Association: FOREIGN AND DOMESTIC: EXEMPT FROM GENERAL INSURANCE LAWS.** Foreign as well as domestic fraternal beneficiary associations are exempt from the general insurance laws.

2. ——: **CERTIFICATE OF INSURANCE: SUICIDE: EVIDENCE.** A finding in an action on a certificate of insurance in a beneficiary association, that the insured did not commit suicide; *held,* supported by the evidence including every reasonable hypothesis of accident.

3. ——: ——: **INSANITY: WAIVER AS TO: WHEN.** There is a waiver of objection to the answer of an applicant for insurance in a beneficiary association, to the question as to insanity in his family, where, on stating the facts, the examining physician who wrote the answer and who is an officer of the association, advised him to answer, "No," which answer was written in the application.

4. ——: ——: **BY-LAWS AGAINST OFFICERS WAIVING APPLY TO PREPARING CONTRACT.** The by-law of a beneficiary association that no officer may waive any of its laws which relate to the substance of the contract for the payment of benefits, refers to the completed contract of insurance and not to the preparing and accepting of the application.

Appeal from Newton Circuit Court.—*Hon. Henry C. Pepper,* Judge.

AFFIRMED.

*J. G. Johnson, O. L. Cravens* and *Barbour & McDavid* for appellant.

(1) Where the reasonable probabilities from the evidence all point to suicide as cause of death so as to establish it in the light of reason and common sense with such certainty as to leave no room for reasonable controversy, a jury should not be permitted to find to

the contrary, and have such finding stand as a verity in the case, but the court should decide the question as a matter of law. Agen v. Life Ins. Co., 80 N. W. 1021; Rens v. Mutual Relief Ass'n, 75 N. W. 991; Reichenbach v. Ellerbe, 115 Mo. 588, and cases cited. (2) No subordinate lodge or officer thereof has power to waive the requirements of the by-laws of the parent organization in so far as the rights of the latter are concerned. Curtain v. Grand Lodge, 65 Mo. App. 294; Borgraefe v. Knights of Honor, 22 Mo. App. 127; Harvey v. Grand Lodge, 50 Mo. App. 477; McMahan v. Maccabees, 151 Mo. 522; Modern Woodmen v. Tevis, 117 Fed. 369; Northern Assurance Co. v. Grand View Bldg. Ass'n, 183 U. S. 308; Kocher v. Supreme Council, 52 L. R. A. 861; Niblack, Mut. Ben. Soc. (2 Ed.), p. 1069; McCoy v. Mut. Ins. Co., 152 Mass. 272; Lyon v. Supreme Assembly, 153 Mass. 83; Groll v. Tower, 85 Mo. 253; Adreveno v. Life Ass'n, 34 Fed. 870; Carrington v. St. Louis, 89 Mo. 226; Squires v. Chillicothe, 89 Mo. 226; Cohen v. Ins. Co., 41 N. Y. 296; Railroad v. Martin, 40 Mich. 667; Foley v. Royal Arcanum, 45 N. E. 456; Rosseau v. Bleau, 131 N. Y. 177; Keller v. Life Ins. Co., 69 S. W. 612.

*White & Clay* and *J. T. Sturgis* for respondent.

(1) The contention below and here made by respondent was and is that the defendant being a foreign corporation with a mere license to do business in this State is not exempt from sections 7890 and 7896, Revised Statutes 1899, relating to life insurance. Kern v. Legion of Honor, 167 Mo. 471; Toomey v. Sup. L. K. of P., 147 Mo. 29; s. c., 74 App. 50; Huff v. Woodman, 85 Mo. App. 96. (2) There is no limitation on his authority whatever in the application or policy; and none in the by-laws except the general, indefinite and sweeping clause of the by-laws that "no officer of this society nor any local camp or officer thereof is author-

ized or permitted to waive any of the provisions of these by-laws or of any other laws of this society which relate to the substance of the contract for the payment of benefits, etc." Such clauses are held to be void on the ground that a corporation which can act only through officers and agents, can not tie the hands of all of them and thus totally incapacitate itself to do business. They must leave some one possessing the requisite authority. Burdick v. Life Association, 77 Mo. App. 629; Life Ins. Co. v. Robinson, 58 Fed. 723; Crouse v. Ins. Co., 44 N. W. (Mich.) 497; Kansal v. Association, 31 Minn. 17, 16 N. W. 430. (3) The plaintiff in this case was entitled to recover on the pleading on the issue of suicide, unless the defendant by competent evidence overcame the presumption and satisfied the jury by a preponderance of evidence that the injury which caused the death of the deceased was intentional on his part. Ins. Co. v. McConkney, 127 U. S. 661; Brower v. Supreme Lodge, 74 Mo. App. 495; Ingersoll v. Knights Golden Rule, 47 Fed. 272; Bacon on Benefit Societies and Insurance, sec. 336a.

BLAND, P. J.—The defendant is admitted to be a fraternal beneficiary association organized under the laws of Illinois. It is licensed to transact insurance business in this State. On December 26, 1900, defendant issued its certificate of insurance for the sum of $1,000 to David H. Shotliff, loss payable to his wife, the plaintiff. Shotliff died on April 12, 1901. The suit is to recover the amount secured by the benefit certificate. Plaintiff recovered judgment in the circuit court from which defendant duly appealed.

Defendant admitted plaintiff was the wife of David Shotliff; that it issued the benefit certificate sued on; that David Shotliff was in good standing with the order when he died, and admitted proofs of loss had been duly and timely made.

Its defense was, first, that Shotliff died of his own

hand, which avoided the insurance; second, that in his application for the policy which was made a part of the contract he made misrepresentations, which also avoided the policy, for the reason that he warranted the truth of these representations.

The misstatement complained of was, that he represented, stated and warranted, that there had been no insanity in his family, when in truth and in fact his sister, Nellie, had prior thereto been insane and had been admitted to an insane asylum at Nevada, Missouri, as an insane patient and had been confined there for a period of six months.

It is conceded that, under the by-laws and contract of insurance, suicide avoids the contract, but it is contended by plaintiff, that the defendant, being a foreign corporation with a mere license to do business in this State, is not exempt from the provisions of section 7896, Revised Statutes 1899, which declares that suicide of the insured, sane or insane, shall be no defense to suits on policies issued by corporations doing business in this State, to citizens of this State, unless it be shown to the satisfaction of the trier or triers of the facts that the insured contemplated suicide at the time of making his application for the policy, and any stipulation in the policy to the contrary shall be void.

1.   All the laws of this State, in respect to fraternal beneficiary associations, were incorporated in one act passed in 1897 (Laws 1897, p. 132). These laws will be found in chapter 12, article 11, Revised Statutes 1899, beginning with section 1408, of the chapter. This section (1408) defines what is a fraternal beneficiary association and declares that they shall be exempt from the provisions of the insurance laws of the State. The section does not mention domestic or foreign corporations, but includes all associations, whether foreign or domestic, which come within the definition of fraternal beneficiary associations.

Section 1410 of the article provides that any foreign association coming within the description given in section 1408, may be permitted to do business in this State by complying with the provisions of the act on obtaining a license or certificate from the insurance commissioner authorizing it to do business in this State.

There is nothing to be found in the Act of 1897, to indicate that the Legislature intended that the law should apply to fraternal domestic societies, but not to foreign fraternal societies admitted to do business in this State. On the contrary, we think that the whole act shows the purpose of the Legislature was to put foreign associations, authorized to do business in this State, on the same footing as domestic ones. They are required to perform the same duties, in respect to making reports, etc., and we have no doubt that both are governed and protected by the act, and that both are exempt from the general insurance laws of the State. McDermott v. Modern Woodmen, 97 Mo. App. 636.

2.   The issue as to whether or not Shotliff committed suicide was submitted to the jury by appropriate instructions. Their finding that he did not die by his own hand is challenged by the defendant on the ground that it was against all of the evidence.

The evidence shows that Shotliff was in good health and of a cheerful disposition; that he was on good terms with all his neighbors, had no enemies, and that his domestic relations were happy; that he was not indebted to any one and was reasonably prosperous in his business; that on the morning he was killed he arose from his bed at about six a. m. and after lighting a fire chatted pleasantly with his wife for a few moments, then went out—as his wife supposed to feed the horse. When breakfast was ready his eldest daughter went out to call him in to breakfast. She found him lying in a path about one hundred yards from the house dead,

with a gunshot wound in his right temple and a thirty-eight caliber revolving pistol lying at his side.

The bullet entered a little above and in front of the right ear, penetrated the skull and fractured the same at a point from two to three inches above and back of the left ear. One load had been discharged from the pistol found at his side. All the other cartridges in the pistol had been snapped but did not explode. He had had the pistol but a few days. When he got it he said he wanted it to shoot a dog that had been bothering him and his family. The pistol was defective. On examination it was found that the hammer would not stand cocked and had to be held back in place by the thumb in order to fire the pistol.

The coroner and one or two other witnesses testified that Shotliff's face was slightly powder-burned. The physician who made the post-mortem examination, and other witnesses, testified to the contrary.

The presumption is that Shotliff did not commit suicide. To overcome this presumption it was incumbent on the defense to show that every reasonable hypothesis of accidental death was excluded by the evidence. Boynton v. Ins. Co., 52 L. R. A. 687.

The inference is very strong that the shot that killed Shotliff was discharged from the pistol found at his side, and discharged while in his hands; but that it was purposely discharged by him with suicidal intent, the evidence does not conclusively show, and we doubt if it preponderates in that direction. There is absolutely no evidence that Shotliff had any cause to commit suicide, or that any trouble was preying upon his mind that would drive him to so desperate an act. On the contrary, the evidence shows that his environment, his family, his happy disposition, his good health, his freedom from debt, and the friendship and respect of his neighbors, would inspire him with the hope of continued life. The pistol was out of order, tricky and uncertain. Shotliff had had it but a few days and had

probably never attempted to use it before and was un-acquainted with the condition that it was in. He had evidently tried to fire several of its chambers but failed and the probabilities are that when it went off and killed him he was making an examination of it to see why it would not fire and in making this examination carelessly handled it and at an unpropitious moment it fired, as many an old, out-of-order firearm has done before. We do not think it can be said that the evi-dence excludes every reasonable hypothesis of accident.

3. The application for insurance is in two parts. The first was made out by Shotliff, the second by the camp physician, and consists of questions that were pro-pounded by the camp physician, the answers to which were written by him and under his supervision, as re-quired by the by-laws of the association. To one of these questions, to-wit: "Has your father, mother, or any brother or sister, etc., been afflicted with insanity?" The answer was "No."

Following this part of the application the insured stated:

"*Applicant Will Please Note this Clause.*—I have verified each of the foregoing answers and statements from 1 to 35, both inclusive, adopt them as my own, whether written by me or not, and declare and warrant that they are full, complete, and literally true, and I agree that the exact literal truth of each shall be a con-dition precedent to any binding contract issued upon the faith of the foregoing answers. I further agree that the foregoing answers and statements, together with the preceding declarations, shall form the basis of the con-tract between me and Modern Woodmen of America, and are offered by me as a consideration for the con-tract applied for, and are hereby made a part of any benefit certificate that may be issued on this application, and shall be deemed and taken as a part of such certi-ficate; that this application may be referred to in said benefit certificate as the basis thereof, and that they

shall be construed together as one entire contract; and I further agree that if any answer or statement in this application is not literally true, or if I shall fail to comply with and conform to any and all of the laws of said Modern Woodmen of America, whether now in force or hereafter adopted, that my benefit certificate shall be void. And I waive for myself and beneficiaries all claim of benefit under this application until it shall be approved by the head physicians and I shall be regularly adopted in accordance with the ritual of this society, and shall make the payments as required by its laws at adoption; and any certificate which shall be issued to me in pursuance of this application shall be delivered to me after adoption and while in sound health, and in pursuance of the by-laws of the society. And I hereby expressly waive for myself and beneficiaries the privileges or benefits of any and all laws which are now or may be hereafter in force making incompetent the testimony of or disqualifying any physician from testifying concerning any information obtained by him in a professional capacity. And I further expressly waive for myself and my beneficiary or beneficiaries the provisions of any law, and the statutes of any State, now in force or that hereafter may be enacted, that would, in the absence of this agreement, modify or conflict with any contract with this society, or cause it to be construed in any way contrary to its express language.

"DAVID H. SHOTLIFF, Applicant.

"(Name in full; initials not allowed.)

"Dated Dec. 11, 1900.

"Answers written by H. H. Johnson, M. D."

Dr. Johnson was the physician of the camp of which the insured became a member. He had been elected by the camp, but his appointment and commission was from the head medical examiner of the district in which the camp was situated. This head phy-

Vol 100 app—10

sician had not only power to appoint and commission, but to revoke the commission of any camp physician.

To the application for insurance was appended the report of the examining physician which is as follows:

"36.    (a) Are you a regularly appointed and commissioned camp physician? Yes. (b) Are you and the applicant alone while making this examination? Yes. (c) Do you know him to be the same man described in the accompanying application? Yes. (d) How long have you known him? Three years.

"48.    Do you know of any facts bearing upon the risk which are not set forth in the foregoing questions? No.

"50.    Do you from your examination of this applicant, and from all other facts within your knowledge, believe said applicant will outlive the full period of his expectancy, according to the American table of experience (copy of which table is indorsed hereon) and do you recommend that said applicant be admitted to beneficiary membership? Yes.

"Dated at Neosho, Missouri, this 11th day of December 1900.

"Hour of examination 3 p. m.

"H. H. JOHNSON, M. D.

"Camp Physician, Camp No. 4290."

In respect to Shotliff's answer to the question about insanity in his family, Dr. Johnson testified that he asked the applicant the question whether any relative of his (naming them) had been afflicted with insanity and he (Shotliff) said: "Yes, sir; I have a sister who was confined in the asylum at Nevada. There was a question as to her insanity and the family physician told them it was not a case of insanity, that it was a case of nerve exhaustion;" that Dr. McCollister had told the family, and him particularly, that his sister was not insane, but her condition was due to her domestic relation and she was not able to go to a private sanitarium, and the family concluded the proper thing to

do in order to get her where she could be properly treated, would be to send her to the insane asylum, and that she came back entirely cured; that he told them that he was satisfied that the domestic relations existing between his sister and stepmother was the absolute cause of her temporary aberration of mind, and it was not insanity; that he (Johnson) talked the matter over with him, and told him that under the conditions probably the proper thing for him to answer would be "none," if he felt that way; that he would not advise him one way or the other. "He [Shotliff] said, 'I will answer that "none," for I firmly believe that she was not insane,' so I answered 'none' in his application. I did not advise him. I wrote the answer in the application based on what Mr. Shotliff told me."

The evidence tends to prove that Shotliff's sister Nellie, prior to his making his application for insurance, was insane and was confined in an insane asylum at Nevada, Missouri, in the year 1896, for a period of six or eight months as an insane patient. That she had been so confined was not denied by the plaintiff, but plaintiff denied that she was in fact insane.

On the insanity issue the court instructed the jury as follows:

"You are instructed that if you find that the affiant, David H. Shotliff, made known to the examining physician all the facts relative to his sister's alleged insanity and confinement and treatment in the insane asylum, then his knowledge is the knowledge of the defendant company and if said company with said knowledge issued the policy sued on it thereby waived the defense of said answer being not true."

The court refused to instruct the jury, as requested by the defendant, to the effect that Dr. Johnson could not bind the association by the waiver of a truthful answer to any question in the application and that if Nellie Shotliff was in fact insane, plaintiff could not recover.

If the above instruction properly declares the law then it is immaterial whether Nellie Shotliff was sane or insane, and the error of the court, if it was error, in excluding certain evidence offered by the defendant tending to prove her insanity, was non-prejudicial.

Under the by-laws of the association it is made the duty of the camp physician to examine each applicant and to accept or reject him, but whether he does the one or the other, he is required to forward his examination and report to the head physician, who finally accepts or rejects the application, regardless of the action or recommendation of the camp physician. The camp physician is therefore an aid to the head physician and, in making his examination and report to the head physician, acts as the agent of the association and not of the applicant. Shotliff, in respect to the insanity of his sister, told Dr. Johnson what he knew and believed to be the truth and the doctor, after hearing his statement of the facts, advised Shotliff to answer "no" to the question as to the existence of insanity in his family, and wrote that word in the application. True, he says he did not advise him how he should answer the question, but his evidence shows that he did advise him and wrote the answer as he advised. Here, then, was an agent of the association whose duty it was not only to ask these questions, but likewise to write answers in the application who, after being put in possession of all the facts known to the applicant about the alleged insanity of his sister, in effect, advised him that she was not insane and to so state in his application and then in pursuance of his own advice, and doubtless honest belief, in effect, wrote in the application that she was not insane.

It seems to us that it was within the scope of Dr. Johnson's employment, as an agent and officer of the association, to waive Shotliff's true, complete and full answer to the question and to advise and answer ac-

cording to his own opinion—that there is a waiver in this case.

By-law No. 34, reads as follows:

"*No Waiver of any Prerequisite.*—No officer of this society, nor any local camp or officer thereof, is authorized or permitted to waive any of the provisions of these laws, or of any other laws of this society which relate to the substance of the contract for the payment of benefits between the member and the society, whether the same be now in force or hereafter enacted."

We think this by-law had reference to a completed contract of insurance, and is not a limitation upon the powers of the agent of the association in preparing and accepting applications for insurance. The officers, to whom the association had entrusted the medical examination of applicants and their acceptance or rejection as members of the association, upon such examination must, in the very nature of their duties, act upon their own judgment and in the exercise of a sound discretion. The by-laws can furnish them no guide for their action, beyond the general description in regard to age, condition of health, etc., required of the applicant to become a member of the association.

In Crouse v. Hartford Fire Ins. Co., 44 N. W. 496, it was held: "Restrictions in the policy, and not in the application, upon the agent's power to waive conditions of the policy, can not be construed to refer to any act or knowledge of the agent that occurred before the policy issued."

In Home Ins. Co. v. Hancock, 52 L. R. A. 665, it was held: "A statement in an application for insurance written by the agent that fee-simple title is in the applicant, when he had only a life estate, will not avoid the policy if the agent knew the true state of the title before the application was signed." In Michigan Shingle Co. v. Ins. Co., 94 Mich. 389, substantially the same ruling was made.

In Mutual Benefit Life Ins. Co. v. Robison, 22 L. R. A. 325, s. c., 58 Fed. 723, it was held, that an insurance company is estopped to question the truth of answers in an application, notwithstanding the applicant warrants the answers to be true, where they are made under a requirement of the company by its own medical examiner, who deduces the answer from facts correctly stated to him by the applicant.''

In Mut. Ben. L. Ins. Co. v. Daviess, 87 Ky. 541, it was held that the insurer is estopped to deny the correctness of representations in the application which his agent with full knowledge of the facts has induced the insured to make.

In Waterbury v. Dakota F. & M. Ins. Co., 6 Dak. 468, it is said to be too well settled to be now questioned that if at the time of issuing the policy the company or its agents know the falsity of a representation by the applicant, the company is estopped from asserting such falsity in order to escape liability.

In Miller v. Mut. Ben. L. Ins. Co., 31 Iowa 216, it was held that the knowledge by the insurer's agent of the falsity of a material statement by the applicant estops the insurer to set up such falsity to avoid payment of the policy.

In Parker v. Amazon Ins. Co., 34 Wis. 363, and Mechler v. Phoenix Ins. Co., 38 Wis. 665, it was ruled that if the agent of the insurer relies upon his own knowledge in filling up the application without consulting the applicant, a mistake of the agent will not avoid the policy.

In Temmink v. Met. L. Ins. Co., 72 Mich. 388, it was held that where the insurer's agent assumed the entire preparation of the application which the applicant signed without knowing its contents, the company can not set up the breach of warranty arising from the incorrectness of answers for which the agent was responsible.

That if the agent of the insurer with knowledge of the facts incorrectly states them in the application, the insurer is estopped to deny their correctness, has been held in many of the western States. American Ins. Co. v. Luttrell, 89 Ill. 314; Eggleston v. Council Bluffs Ins. Co., 65 Iowa 308; Sullivan v. Phoenix Ins. Co. of Brooklyn, 34 Kan. 170; Williamson v. New Orleans Ins. Ass'n, 84 Ala. 106; Crescent Ins. Co. v. Camp, (71 Tex. 503; Dunbar v. Phoenix Ins. Co., 72 Mich. 492; Menk v. The Home Ins. Co., 76 Cal. 50; Continental Ins. Co. v. Pearce, 39 Kan. 396; Pickel v. Ins. Co., 119 Ind. 291.

In Cotten v. Fidelity & C. Co., 41 Fed. Rep. 506, it was held that a general warranty against bodily infirmity in an application did not extend to nearsightedness when the applicant wore spectacles, which the agent of the insurer saw.

In Follett v. U. S. Mut. Acc. Ass'n, 107 N. C. 240, it was held that where insurance has been had upon an application representing the insured as free from bodily infirmity, which was contested because of deafness, the insured may show that the insurer's agent knew of such deafness before and while soliciting such insurance from conversations with him.

In Pudritzky v. Supreme Lodge K. of H., 76 Mich. 428, it was held that where a physician acting as agent for the company, in examining an applicant for life insurance, assumes to write out the answers to the questions upon his own knowledge of the facts, rather than from the answers given by the applicant, the answers as given by him are conclusive on the company.

In some of the eastern States a different doctrine seems to prevail. In some of these States the application is considered as a part of the contract and if in fact the representations in it are in a material respect untrue, an action at law can not be maintained, and oral testimony can not be received to show either that the company, when it issued the policy, knew that the representations were untrue, or that the untrue representa-

tions were inserted in the application by the agent employed by the company to solicit the insurance without the knowledge of the applicant who had orally stated the truth to the agent. McCoy v. Met. Ins. Co., 133 Mass. 82; Plympton v. Dunn, 148 Mass. 523; Franklin F. Ins. Co. v. Martin, 40 N. J. L. 568; Wilson v. Ins. Co., 4 R. I. 141; National L. Ins. Co. v. Minch, 53 N. Y. 144; Barteau v. Ins. Co., 67 N. Y. 595; Kenyon v. K. T. & M. M. A. Ass'n, 122 N. Y. 247; State Mut. Fire Ins. Co. v. Arthur, 30 Pa. St. 315.

The Missouri cases are in accord with the cases in the western States and hold that, where an agent of an insurance company has authority to take applications for insurance and to fill up the application and to do all things which may be needful in perfecting it, his acts are the acts of the company and from which it follows necessarily that the doctrine of estoppel in the case applies and that the company will not be allowed after a loss to disprove statements made by it through its agents, notwithstanding the statements may be warranted to be correct. Thomas v. Hartford Fire Ins. Co., 20 Mo. App. 150; Combs v. Hannibal Savings & Ins. Co., 43 Mo. 148; Rissler v. Ins. Co., 150 Mo. 366; Parsons v. Fire Ins. Co., 132 Mo. 583; Montgomery v. Ins. Co., 80 Mo. App. 500; Cagle v. Ins. Co., 78 Mo. App. 341; Williams v. Bankers' & Merchants' T. M. F. Ins. Co., 73 Mo. App. 607.

In Kausal v. Minnesota Farmers' Mut. Fire Ins. Ass'n, 31 Minn. 17, it was held: "Agents of an insurance company, authorized to procure applications for insurance, and forward them to the company for acceptance, must be deemed the agents of the insurer in all that they do in preparing the application, or in any representations they may make as to the character or effect of the statements therein contained. Hence, where such agent, either by his direct or indirect act, makes out the application incorrectly, notwithstanding all the facts are correctly stated to him by the applicant,

, the error is chargeable to the insurer and not to the insured. This is the rule in the case of 'mutual' as well as of 'stock' or 'proprietary' companies.''

The authorities in this State and in the other western States support this doctrine. We, therefore, hold that Dr. Johnson was the agent of the association in filling out the application of Shotliff for insurance. The evidence shows that he was put in possession of all the facts in reference to the sanity of Nellie Shotliff, and that the answer to the question as to whether or not any of the Shotliff family had been afflicted with insanity was made by him or on his advice, and that the company is bound by the answer and estopped to assert that Nellie Shotliff had been insane.

It follows that the judgment must be affirmed. It is so ordered. *Reyburn* and *Goode, JJ.,* concur.