Hurlbut, J.,
dissenting:-
If I properly understand the majority opinion, it reverses the judgment of the trial court principally upon the ground that the insured, Henry Conter, made false answers to questions propounded to him in his application for the certificate; that the record conclusively showed such answers to be false; and that, such being the case, the warranties and statements incorporated in Conter’s application, as well as in the certificate itself, concerning answers made in the application, conclusively bar the beneficiaries from recovery in this action. It further appears in the opinion that the question of waiver on the part of defendant company received but passing notice, though such issue was pleaded and earnestly maintained by plaintiff throughout the controversy. I am of the impression that such waiver is the controlling and dominating issue in this case, ahd that every other point raised by the record is subservient to it. I think it cannot be gainsaid that issues similar to those determined by the court in the majority opinion have be'en presented *53 to the appellate courts throughout the country probably as often as any other kind or class of issues known to the law. Their determination has germinated a multitude of adjudicated cases throughout the various jurisdictions, and the same are in hopeless conflict upon the question of waiver and liability of insurance companies under policies and beneficiary certificates such as here considered. There can be no question but that the majority opinion is supported by numerous authorities of' enviable repute, while, on the other hand, authorities of equal standing have construed the same kind of contracts as in the ease at bar, and reached, conclusions and rendered opinions in direct opposition to those here announced. The majority opinion and those authorities cited in support thereof appear to adopt an unvarying rule that in this class of cases every line, word and sylla-' ble, found in the policy or certificate, must be strictly construed and rigidly enforced in favor of the company, taking but scant notice of defenses of waiver generally ■pleaded and urged by the beneficiaries; while, on the other hand, those authorities which militate against the class just mentioned appear to grasp upon anything found in the record pertaining to the'securing and issuing of the policy which would justify a ruling that the company had waived its right to insist upon the strict letter of the contract as against the beneficiaries, and thus prevent a forfeiture of the policy. I do not want to be understood, by the language used, as intimating that this court, or others entertaining the same views on a contract of this character, is actuated by any prejudice for or against insurance companies, their policy-holders, or beneficiaries thereunder. It is to be regretted that all life insurance policies and certificates of beneficiary companies are not short, and couched in brief and -simple language, so that policy-holders or members could be justified in the belief (which they usually entertain) that their wives or chil *54 dren, upon their death, would he the possessors of certificates of indebtedness equal in financial integrity to government bonds. In my judgment, it would challenge the ingenuity of the greatest living lawyer to draft an application or certificate containing more subtle, unreasonable and inequitable warranties, provisions and restrictions, against the insured, than those found in the printed application and certificate in the instant case. It is a safe suggestion, in view of the majority opinion, that but a small percentage of the million or more members of the appellant company have a clear conception of the uncertain protection afforded their wives and children under issued policies and certificates like those here considered. If, there is anything in this criticism, it might be nullified if those courts holding the insured to the strict letter of the contract would require the insurance company, where the policy is being contested, to show that the attention of the insured, prior to the signing of the application and issuing of the policy, had been specifically called to the harsh and unreasonable provisions and restrictions against him contained therein. Many courts adopt this rule in contracts of passengers- and shippers with common carriers, and its enforcement has resulted in great benefit to the public at large.
I am willing to admit that, while Conter stated in his application that he had never been intoxicated, and that he used intoxicants only to the extent of “an occasional beer,” the undisputed evidence showed that at the time he signed his application, and for many years prior thereto, he had indulged extensively in the use of intoxicating liquors, and had been intoxicated a number of times; and, were there anything in the record to show that, at the time the certificate was issued, neither the company nor its agents or officers, had any knowledge of Conter’s habits in this regard, the company should not he held to liability in any amount upon the same.
*55 The record here shows that Hume was the assistant deputy head consul of the order, and, while holding that position, came to Denver to organize the local camp at Globeville some time in January or February; that he appointed and employed Dr. Yan Landingham to examine Conter for membership; that he discussed with the witnesses Miller and Newman the proposed organization of the local lodge, and the question of presenting members for that lodge, their qualifications, and particularly the qualifications of Conter for membership. It was admitted at the trial that Hume had authority to solicit members, take the documents examined, of whatever nature, and forward the same to the authorities, and, presumably, to employ physicians and direct them to make professional examination of proposed members. The record shows that the benefit certificate was issued by the head consul, and further shows his power to appoint assistant deputy head consuls and fix their compensation. Hume, therefore, being an agent created by the head consul, could not well be considered an agent or representative of the local camp, as the same was not in existence at the time he was engaged in the business of forming it. As he was the direct representative of the chief executive officer of the society at the time of his sojourn in Denver, all knowledge and information obtained by him, respecting the qualifications of proposed members for the new camp, ought to be taken as knowledge and information of the head consul and the order itself. His agency appears to have been of a much higher degree than that of one simply soliciting members for camps already established. It seems that the occasion of his visit to Denver at the time mentioned was for the purpose of creating the new camp, and seeing that it was properly established as required by the rules of the order. Certainly a mere soliciting agent is not generally empowered with authority to establish new camps, hire *56 physicians, and direct examinations of proposed members, as was done by Hume. Under this showing and under authority of Supreme Lodge K. of H. v. Davis, 26 Colo., 252, 58 Pac., 595, I think Ilume was an agent of the order, and that knowledge and information concerning the qualifications of Confer for membership, acquired by him in the performance of his duties in that respect, is knowledge and information chargeable to the order, as well as to the head consul. It should also be presumed that Hume promptly notified the chief executive of the order at the home office of the objections urged by the witnesses Miller and Newman to Confer’s becoming a member, as well as their reasons therefor. The same remarks may apply in regard to Hume’s knowledge of any disorder or serious affection of Confer’s heart at the time. It is undisputed that, in addition to the objection made by Miller to Confer’s becoming a member of the order on account of excessive liquor drinking, he also objected to such membership by reason of his belief that Confer was afflicted with heart trouble to a degree making him an undesirable member. Miller was a druggist, and, by virtue of his occupation, more or less familiar with human ailments. These facts should have put Hume upon inquiry, and to a further investigation concerning such objections. I think, however, that whatever the answers of Confer might have been concerning the condition of his heart at and prior to the time of his application is of but little moment, as his answer that he had “never had any disease of the heart” was corroborated by the testimony of defendant’s physician, Dr. Van Landingham. He testified that he made a careful examination of Confer ’s heart by modern, approved methods at the time of his examination, and failed to discover any trouble whatever therewith, and certified that he believed he was free from any heart trouble at that time. Certainly the evidence of an experienced physician upon this question *57 should be conclusive as against a layman’s diagnosis of heart ailments. Here Conter’s testimony was corroborated by the physician. In addition to this testimony, Dr. Lee, a witness, examined Conter about one month before he died to ascertain his physical qualification for membership in the Prudential Insurance Company, and passed him as a safe .risk. All this undisputed testimony on this point ought to eliminate any question as to Conter’s heart being sufficiently normal to admit of his membership in the order. The evidence is also undisputed that in January or February, 1909, and prior to the time the insured made his application for membership,' the two witnesses, Newman and Miller, discussed with Mr. Hume, assistant deputy head consul of the order, the advisability of accepting insured as a member of the local camp, and both advised against it and gave as reasons that insured drank too heavily and was not a fit person by reason thereof for such membership, Mr. Miller further telling him that he thought insured’s heart was in bad condition. It is therefore clear that for about six weeks before the membership certificate was issued Hume knew that insured was a heavy drinker, and that ther was at least some question as to the condition of his heart. This knowledge-was imparted to Mr. Hume while he was actively engaged in soliciting and considering the qualifications of proposed members for the new local camp at G-lobeville. From the majority opinion, I extract the following:
“The statement made by Miller to Hume that the assured drank too heavily, and the statement of Newman to Hume that the assured ‘was too much of a drinker, to (his)'knowledge, for fraternalism,’ were vague opinions of the witnesses which did not necessarily conflict with the statements of the assured in his medical examination. * * * They were mere hazy opinions bottomed on no facts disclosed in the record at least. ’ ’
*58 I notice here that the testimony of Miller and Newman, concerning Conter’s liquor drinking habits and heart condition, is designated in the opinion as “vague opinions of the witnesses” and “mere hazy opinions bottomed on no facts disclosed in the record at least.” Miller testified as follows:
“I had a discussion with Mr. Hume over the organization of that lodge and the presentation of members for. the lodge. I think I was one of the first men consulted by Mr. Hume as a prospective member. * * * ' During that conversation I discussed with Mr. Hume the advisability of securing the application of Henry Confer. I had known Confer something over a year. I told Mr. Hume he was not a desirable member for the organization. The reasons that I gave were that he drank too heavily and I thought his heart in bad condition.”
Mr. Newman testified:
“I worked with him (Hume) soliciting members for the Modern Woodmen. I had a discussion with him about taking the application of Henry Confer for membership in the Modern Woodmen. * * * The reason I gave for not writing him up was that he was too much of a drinker for fraternalism. ”
I am at a loss to discover wherein this positive, plain and unambiguous information given by Miller and Newman to Hume should be designated as “vague and hazy opinions of the witnesses.” Both were relied upon by Hume for other information in obtaining members. One of the informants was a reputable merchant, and both had known Confer for years, were his neighbors and intimate acquaintances. Who else but the neighbors and associates of Confer could have.given reliable information upon the subject? Where could Hume have applied, and to whom, with a hope of securing more reliable information concerning Conter’s qualifications for membership? Who but a neighbor or intimate acquaintance *59 of Confer could have given information concerning the subject more entitled to credence? Who but a neighbor or intimate acquaintance would be more likely to know the habits and general physical condition of Confer? Where is there anything vague or hazy about these statements of Miller and Newman? It is a fair presumption that the very snbjeet matter of the conversation was one of great importance to this company, and can safely be presumed to have been material to the risk. Here was the direct representative of the highest executive officer of the company, strictly in the line of his duty, personally seeking information of divers persons which would qualify or disqualify a prospective member for membership under the rules of the order. No other person but Hume, as shown by the record, was authorized at that time to speak for the general order or head officers thereof, or transact any business for or in their behalf. He was their sole and only representative present, at and about that time, with any power to organize a constituent branch or camp and pass upon the qualifications of the proposed members. He was told plainly and unequivocally that Confer was not a good risk; that he would be objectionable as a member of the proposed camp, for the reason that he indulged to excess in the use of intoxicating liquors; and that it was Miller’s belief that his heart was not in good condition.
The court further says: “In our opinion, under the condition of the record, no rule of ordinary diligence required the appellant to pursue its investigation beyond the medical examination.” I take-issue with the court in this statement.. It would seem hard to imagine a situation making it more imperative for an agent or one interested to seek further information upon a subject than the one here disclosed. This conversation took place at Grlobeville, a small suburban settlement of Denver, and if Hume doubted the veracity or good faith of either Miller *60 or Newman lie could easily have interrogated other merchants and members of that community and satisfied himself to the fullest extent of Confer’s qualifications to become a member of the camp. These statements of facts by Miller and Newman were not mere idle passing comments upon Confer’s habits and physical condition, but important facts elicited by Hume in deciding who would be acceptable members for the local camp. It was the subject, and the only subject, under consideration at the time. The conversations were between Hume on the one part and an existing member of the order and a prospective member of the camp to be organized on the other. Prospective members and their qualifications were the controlling subjects of the conversations, and it was strictly business of the order in which Hume was engaged. Prom any standpoint from which the situation may be considered, it is a reasonable view that it was the duty of this assistant deputy head consul, if governed by motives of integrity and real interest in the good of the order, to have, immediately upon receiving this information, positively rejected Confer as a prospective member of the camp, and to have seen to it that his application was not considered or received for the purpose of becoming such member; or, if he had declined to take such action, under a belief that the information he received was not entirely reliable or was subject to doubt, the only honorable thing left for him to do was to investigate fur-' ther and continue his investigation until he was satisfied of the real character of Confer concerning his liquor-drinking habits and physical condition; indeed, I think he should have gone further and written at once to the head office at St. Louis and informed them that Confer was not qualified to become a member of any camp of that order. He occupied a position of great trust and-importance in the order, as compared with an ordinary soliciting agent who might be in the employ of the order *61 today and gone tomorrow. The order shonld not he permitted to escape liability tinder the circumstances shown, by reason of the warranties and conditions contained in the application and certificate. As a matter of law the order shonld be held- to have waived any warranty or condition contained in those documents, under the facts here shown.
As to the warranty to the effect that this information, acquired by Hume during these conversations with Miller and Newman, should have been reduced to writing and placed in the hands of the head officers before the certificate was issued, I believe this knowledge was in law the knowledge of the head officers, who were thereby presumed to know what Hume knew. The fact that such knowledge was not in writing should be held immaterial. Had Hume performed his duty, as I view it, he would have written at once to the head officers, as above suggested, informing them of Confer’s disqualifications.
In the case of Supreme Lodge K. of R. v. Davis, supra, our supreme court had under consideration a defense interposed to an action upon a beneficiary certificate upon the ground that the insured, at the time he made his application for membership, falsely stated his age. The uncontroverted evidence there showed that in May, 1890, after the membership certificate had been issued, the beneficiary notified the reporter of the local lodge that the age of insured was greater than represented by him when he became a member, but after such notification the assessments thereafter becoming due- for May and June were received and retained by the lodge. The supreme court held that under the circumstances the order could not escape liability by reason of the- false representation as to age, and that such defense was waived by accepting and retaining the two assessments mentioned, after it became aware of such falsity. Jus *62 tice Gabbert, speaking for tbe court, used this language, viz.:
“A material, wilful misstatement of an applicant for membership in the order regarding his age would doubtless vitiate the contract of insurance if not known by the lodge or its officers to whom applications for membership are addressed. * * *
“It will also be presumed that he (the agent) has communicated all information to the order which he obtains in the discharge of his duties in making collections on its behalf which affects its rights; or, if he has not, still the order having intrusted him with the particular business, the member paying his assessments to him has the right to deem his acts and knowledge those of the order. *' * * Appellant could not continue to collect assessments after knowledge of misstatements regarding the age of deceased which would affect its rights, and then, when the contract is executed, escape liability upon the ground that he was guilty of a fraud in procuring his insurance; and the financial reporter of the subordinate lodge of which deceased was a member, having-received his assessments after notice of alleged misrepresentations regarding his age, and being an agent of the order for the purpose of making those collections, the knowledge which he then had regarding the age of deceased, or his misstatements on that subject, was the knowledge of the order (McGurk v. Met. L. I. Co., 56 Conn., 528, 16 Atl., 263, 1 L. R. A., 563; Bacon’s Benefit Societies, sec. 160; Coolidge v. Life Ins. Co., 1 Mo. App., 109), and its acceptance and retention of these assessments, with that knowledge, is a waiver of its right to now raise any question on that subject; and, therefore, whether the evidence sought to be introduced by appellant, regarding the age of Davis, was competent or incompetent, it is not necessary to determine, for, according to the admitted facts, it was precluded from asserting *63 that defense in this action. — Niblack’s Benefit Societies, pp. 565, 566; Schwarzbach v. Ohio Valley Protective Union, 25 W. Va., 622, 52 Am. Rep., 227; Watson v. Centennial Mut. Aid Assn., 21 Fed., 698; Ball v. Granite State Association, 64 N. H., 291, 9 Atl., 103; The Masonic Benefit Assn. v. Beck, 77 Ind., 203, 40 Am. Rep., 295.”
In that case the benefit certificate contained a statement to the effect that the statements made in the insured’s application for membership, and those made by him to the medical examiner, were to become part of the contract. It will be noticed that the knowledge of the false statement made by the insured, concerning his age, did not come to the society until after the policy had been issued and delivered. In the case at bar the falsity of the statements of the insured, concerning his intemperate habits, was known to both the assistant deputy head consul and Miller (who afterwards became clerk of the local camp) before the benefit certificate was issued. Such knowledge was possessed by them before Confer filed his application for membership.
It may be well at this time to notice that the witness Miller was one of the charter members of the local camp, and elected clerk thereof when it was organized. He had full knowledge of the extent to which Confer used intoxicating liquors, as well as the possibility that his heart might be affected.. This knowledge should be considered knowledge of the local camp, which knew that Confer was one of its members. The record does not show any correspondence between the local camp and the home office concerning Confer’s disqualifications, or any objection to Confer remaining a member of the camp.
Many reputable courts, including those next hereinafter cited, hold in cases of this kind that the local lodge or camp bears the relation of agent to the parent organization, with reference to the business transacted at the place where the local camp is situated. — Order of Colum *64 bus v. Fuqua (Tex. Civ. App.), 60 S. W., 1020; M. W. A. v. Breckenridge, 75 Kan., 373, 89 Pac., 661, 10 L. R. A. (N. S.), 136, 12 Ann. Cas., 636; Knights of Pythias of the World v. Bridges, 15 Tex. Civ. App., 196, 39 S. W., 333.
The appellant, in so far as the insurance features of the organization are concerned, is in effect a mutual life insurance company, and the general rules governing’ associations of that character control it in the transaction of this branch of its business. — Chartrand v. Brace, 16 Colo., 19, 26 Pac., 152, 12 L. R. A., 209, 25 Am. St. Rep., 235; Supreme Lodge K. of H. v. Davis, supra; Titus v. G. F. Ins. Co., 81 N. Y., 410.
On the question of waiver, defendant received the initiation fees, dues, etc., from Confer, and accepted him into full membership of the order after complete knowledge of his false answers touching his.liquor habits. This should be sufficient to estop the company from insisting on forfeiture. In law, the head officer (head consul) possessed this information before the certificate was issued, by reason of the fact that his appointee and representative, Hume, was fully informed of the same. In Prudential Ins. Co. v. Hummer, 36 Colo., 208, 84 Pac., 61, the supreme court re-submitted the case on the question as to whether certain warranties made by the insured, in his application, concerning his health, were or were not true, and, if untrue, whether or not the company, by estoppel or waiver, was precluded from relying upon such false statements as a defense to the action. See Shotliff v. M. W. A., 100 Mo. App., 138, 73 S. W., 326; Order of Columbus v. Fuqua, supra; M. W. A. v. Breckenridge, supra; M. W. A. v. Colman, 68 Neb., 660, 94 N. W., 814, 96 N. W., 154; Biermann v. G. M. L. I. Co., 142 Iowa, 341, 120 N. W., 963. In the last cited case the facts are similar to those in the case at bar. The court says: *65 use of intoxicants, or, as put by some of the witnesses, was a drunkard at the time the policy was applied for; but it is equally apparent that appellant bad notice and knowledge of the truth in this respect when it accepted the application and entered into the contract. The appellant had a local office in Marshalltown where the deceased lived, and was evidently a well-known character. An agent in charge and several sub-agents or soliciting agents worked in and about the city and vicinity. The soliciting agent who took the application of the deceased knew of his drinking habits. When the insurance was being negotiated, it was a subject of conversation between the several agents of the appellant in the city as to the doubtful insurable condition of the deceased because of his habits. The application itself discloses his habits, to some degree at least, for, while saying that the applicant did not use malt or spirituous liquors ‘to excess,’ it further informs the company that he did take ‘a glass of beer occasionally.’ This was a sufficient disclosure to suggest to a discreet person the advisability of further inquiry if the subject was one deemed of vital importance. * * * Under such circumstances, the fact that the warranty was broken when made constitutes no defense. ’ ’
*64 “It is true the defendant made a strong showing to the effect that the deceased was greatly addicted to the
*65 In Collver v. M. W. A., 154 la., 615, 135 N. W., 67, the action was against the same company which is appellant here, and the by-laws and warranties pertaining to the contract are practically the same in both cases, except that the warranty requiring information to be in writing and submitted to the head officers is not mentioned in the Gollver case. The court there held the company to have waived the conditions of thé certificate by receiving assessments' from the member after knowledge of his intemperance subsequent to the issuing of the certificate. See also Thomas v. M. B. A., 25 S. D., 632, 127 N. W., 572; Miller v. M. B. L. I. Co., 31 la., 216, 7 Am. Rep., 122. In the latter case the court held that the *66 knowledge acquired by a soliciting agent in the line of his duty is knowledge of the company, he represents, the court saying:
“To this latter view the'judicial mind seems rapidly tending, and it is certainly more in accord with the' enlightened and progressive spirit of the age. These companies select their own agents, require them to enter into bonds for the faithful discharge of their duties, and send them forth provided with blanks and clothed with all the insignia of authority. If their ignorance or their cupidity leads them to recommend improper risks, it is more in consonance with reason that the loss should be borne by the company than that the assured should be made the victim of the incompetency or the avarice of the agents. More especially is this true in view of the fact that the company has the means of indemnity through the bond of the agent. Just principles of public policy require that these companies should be held to a strict degree of responsibility for the acts of their agents. They will thus be led to the” exercise of greater circumspection, ,in the selection of agents. * * *
“It is quite true that the technical constructions which have pertained with reference to contracts of this kind, blocking the pathway to justice, and leading to decisions opposed to the general sense of mankind, should be abandoned, and that these corporations, grown opulent from the scanty savings of the indigent, should be held to the same measure of responsibility as is exacted of individuals. ’ ’
Kausal v. M. F. M. F. I. A., 31 Minn., 17, 16 N. W., 430, 47 Am. Rep., 776; Garfinkel v. Alliance Life Ins. Co., 140 Ill. App., 380; Pringle v. M. W. A., 76 Neb., 384, 107 N. W., 756, 113 N. W., 231.
Innumerable cases in addition to those already mentioned could be cited which are in harmony with them, *67 but no good purpose can be accomplished by further extending the list.
The evidence appears to be undisputed that Conter’s death was caused by fatty degeneration of the heart, but I find nowhere in the record any testimony showing that the intemperate use of liquor directly or indirectly caused his death. The testimony of the physicians goes no further than to show that the intemperate use of liquor is one of the primary causes of fatty degeneration of the heart. But nowhere do they intimate that Conter’s death resulted from intemperate drinking. Dr. Bennett, a witness, testified that he assisted in performing the autopsy on the body of Confer, and stated:
“The only cause of death of Henry Confer that I could determine, assisting Dr. Carlin, was fatty degeneration of the heart. There may be many causes of fátty degeneration of the heart. A person that has lived a careful life, through no fault of their own, may be subject to it and die from it, and persons leading careless lives will be more subject to it. * * *
“Many causes may contribute to it. The torpidity of the liver, poor circulation, a bad digestion, and all these things which tend to upset.the heart.”
The claim by appellant that Conter’s death was caused indirectly by intemperate drinking is entirely wanting in proof to sustain it.
Appellant contended that the certificate was forfeited by Conter’s false answer to the question, “Do you use intoxicating liquors daily?” to‘which he answered, “No.” This issue was fairly left to the jury, and is presumed to have been decided in favor of plaintiff.
Another point urged by appellant is that the certificate was forfeited by the alleged false answer given to the question, “Have you within the last seven years been treated by or consulted any person, physician or physicians, in regard to personal ailment?” to which question *68 Conter answered, “No:” This was another issue presented by defendant as a defense, upon whom the burden was placed to establish the same by a préponderance of the evidence. In my judgment, considering the testimony in the light most favorable to defendant, sufficient proof was wholly wanting to establish that defense. Miller testified on this point as follows:
“He (Conter) bought some strychnine tablets from me on one or two occasions. * * * To my knowledge he at no time said anything to me about affliction of the heart, nor that his heart was acting badly. We (Conter and witness) were in the store one day and he (Conter) complained of dizziness. * * * I suggested to him his stomach was out of order and it might be a good idea for him to take a few strychnine tablets. Prior to that time I noticed Mr. Conter’s complexion, and I thought he did not have a very strong heart, but did not care to say anything to him. * * * Later on he came in and bought strychnine tablets.
“Q. You gave him those strychnine tablets believing yourself from the observation you had made of his condition that it was caused by trouble of the heart?
“A. Not necessarily. I did not know whether that was why he bought them or not.
“Q. I am asking you why you gave him the strychnine tablets.
“A. I gave them to him because he wanted them.
“Q. No, but you said he became dizzy and you thought his heart was in trouble.
“A. I did not tell him that. I said I thought so. ’’
This certainly does not show that Miller was treating Conter for heart trouble or had any settled conviction that he had heart trouble. The evidence entirely fails to show that any physician or other person treated Conter for any heart trouble whatever.
I have no criticism of the rule as stated in the ma *69 jority opinion to the effect that insurance companies generally, and their policy and certificáte holders, are át liberty to enter into any contract they desire, not prohibited by law, and that it is the duty of courts to enforce such contracts as they find them. ' At the same time I know of no law or rule that prohibits a party to a civil contract from waiving warranties or conditions inserted therein for his own benefit. When §uch waiver is satisfactorily shown, the party so waiving’ is estopped from pleading or insisting upon forfeiture of the contract. I think in this case the company did waive the warranties and conditions contained in the application and’ certificate; that the knowledge of Hume, concerning Confer’s disqualification for membership in the order, by reason of his liquor habits, was, under the facts disclosed by the record, knowledge of the head officers of the company; and that receiving from Confer all fees and dues chargeable to him as a member, and issuing to him a full certificate of membership, after such information, ought to, and should, be taken as a waiver on the part of the company of such warranties and conditions.
In the consideration of this case, and in searching authorities, I am forcibly impressed with the fact that the printed reports of the several states are honeycombed with cases wherein this appellant appears as a party, and seemingly has felt itself called upon with deplorable frequency to protect its treasury from the “attacks” of widows and orphans of deceased members, which mem-’ bers in their simplicity have indulged the belief that in case of death the silent certificates held by them spelled comfort, sustenance, education and support, to those most cherished and loved by them.
It appears to me that the majority opinion in effect suggests to every association of this character that it is neither its legal nor moral duty to exercise any caution or discrimination in selecting agents to secure members *70 or transact its business, and that it need not concern itself as to the probity or veracity of such agents. The direct result of the opinion places the entire responsibility of an agent’s dishonesty or derelictions upon the insured, or, more unfortunately, upon the innocent beneficiaries. By inserting in policies a warranty, such as here found, requiring written notice to head officers, etc., all consideration by the company of an agent’s honesty, or veracity becomes useless and unnecessary.
Decided July 14, A. D. 1913.
Rehearing denied December 8, A. D. 1913.
I think the judgment should be affirmed. I am authorized to say that Judge Morgan concurs in this dissent.