FURBUSH v. MARYLAND CASUALTY CO.

1. ACCIDENT INSURANCE—INTENTIONAL HOMICIDE.
   An intentional homicide is an accident, within the meaning of an accident policy, if insured himself was in no way responsible for his death.

2. SAME—SUICIDE OR MURDER—QUESTION FOR JURY.
   Evidence examined, and held not necessarily inconsistent with the theory that insured came to his death through homicide rather than suicide; making it a proper case for the jury.

3. SAME—EVIDENCE—OPINIONS.
   Upon an issue whether insured committed suicide or was murdered, a witness could not give his opinion, from the condition of the snow in which the body was lying, the condition of the body, and other surroundings, as to whether the body fell in such position or was placed there, or whether a man, shot while in a cutter, could have fallen in such a position; the drawing of such conclusions being for the jury.

4. SAME—CIRCUMSTANCES OF DECEASED.
   But testimony that insured had been intemperate in his habits for some time prior to his death, and was in straitened financial circumstances, and had worried about his affairs, was admissible.

Error to Alpena; Emerick, J. Submitted April 25, 1902. (Docket No. 76.) Decided June 24, 1902.

*Assumpsit* by Louesa C. Furbush against the Maryland Casualty Company upon a policy of insurance. From a judgment for plaintiff, defendant brings error. Reversed.

*Charles R. Henry,* for appellant.

*R. J. Kelley,* for appellee.

HOOKER, C. J. Defendant has appealed from a judgment in favor of the plaintiff upon an accident insurance policy upon the life of her husband, who was found dead in the highway.

The deceased was a lumberman, and on the day in question started to go from Nash to Washburn, a distance of a few miles. He was afterwards seen in Washburn between 9 and 10 o'clock the same day. A witness, one Lahey, one of three who found the body, started from Washburn to go to Nash. When they were about 3 or 4 miles from Washburn, Furbush passed them, driving alone in a sleigh. After walking 15 or 20 minutes more, the witness saw something in the road, which he took to be a buffalo robe. They went on a little farther, and found that it was the body of deceased. They left one of their number to watch the body, and then the other two walked on about half a mile, and came to some section men working on the railroad, and told them that there was a man dead down on the road, and asked what they should do, and were told that the best thing they could do was to go to Nash and telephone to the sheriff. Thereupon all three of them went to Nash, and the station agent did telephone to Washburn, advising them to remain as witnesses. A party was made up at Washburn by the sheriff of Bayfield county, Wis., and started for the body, and arrived at about 1:30 or 2 in the afternoon, and held an inquest.

It appears to have been the theory of the plaintiff that the deceased was intentionally killed by another person. The defendant claims that he intentionally took his own life, and that, whether it was a case of suicide or homicide, plaintiff should not have been permitted to recover.

The testimony offered on the trial tended to show that, shortly before the section men heard of the death, the horse of deceased was seen by them running away with the cutter, nobody being in it. The body was found close to the traveled part of the highway, the feet lying nearer the track than the head. The witness Lahey, who appears to have been a tramp, testified that he stayed the night before in an old barn at Washburn with Wallace, and met Parker the next morning in Washburn; that it was the first time that he had seen Parker; he had known Wallace two days. Lahey said that the body, when found, had a buffalo coat on, which was open; the head of the body was lying towards Washburn; that he made an examination of the snow on each side of the road to discover footprints; the traveled track was beaten down hard; that he did not see any revolver lying in the traveled part of the road near this body. "There were no tracks, trails, or roads that were beaten and traveled leading from the place where I first saw the body, except the county road."

The next witnesses to see the body appear to have been William Goodrich and Mike Miller. Witness Goodrich caught the horse about 10:30, and in about 20 minutes was informed by three men, who came up, that the owner of the horse was lying dead in the road. He went to Mr. Bates' office, and had him telephone to Washburn, and then he went to see the body, taking Miller, the superintendent of the railroad, with him. These men did not see any revolver lying in the beaten track of the road. They found a pocketbook with nothing in it lying between the dashboard and the footrest in the cutter. Miller testified that he noticed no tracks, trails, nor paths in the snow outside of the traveled tracks.

Jared Welton testified that he was under-sheriff of Bayfield county, and received the telephone message. He went to where the body was, and, when he got there, there were several of the Elks of Ashland there, who got there about the same time that he did. He testified that he was the first man up to the body; that it lay flat on its

back; that his coat, vest, and shirt and underclothing were unbuttoned with the exception of the collar; his right hand was stretched out on the snow. He found a gold watch and chain and a $5 bill and two silver dollars and some other articles upon it. He also found a revolver lying near his head on the left side in the snow. There had been one shot fired out of it, which appeared to be fresh. When they first examined the body there was a good deal of blood on the left side around the ear, and at the inquest it was supposed that he had put the gun in his left ear, and that the bullet came out on the right side. The testimony of the physicians was that the bullet entered the right side of the head. The witness testified that he examined the snow and the tracks around there to find indications of a scuffle, but there was only one track, which was close to the right-hand side of the head and a little ways from the head. Other witnesses testified that there were two footprints near the head, and no other tracks. There was testimony that the deceased had a glove upon his right hand and a glove partially on his left hand.

Upon this testimony the court refused to direct a verdict for the defendant.

Defendant contends that, under the policy in question, it did not insure against any intentional killing, either by the assured or by another. The policy contained the following, viz.:

"In case of injuries, fatal or otherwise, intentionally inflicted upon himself by the assured, or inflicted upon himself or received by him while insane, the measure of this company's liability shall be a sum equal to the premium paid.".

It is contended that an intentional homicide was not an accident. The text-books have been slow to admit that such a killing is accidental, but the majority of the adjudicated cases hold that it is where the deceased is in no wise responsible for it. *Insurance Co.* v. *Bennett*, 90 Tenn. 256 (16 S. W. 723); *Hutchcraft's Ex'r* v. *Insurance Co.*, 87 Ky. 300 (8 S. W. 570, 12 Am. St. Rep. 484);

*Phelan* v. *Insurance Co.*, 38 Mo. App. 640; *Richards* v. *Insurance Co.*, 89 Cal. 170 (26 Pac. 762, 23 Am. St. Rep. 455); *Jones* v. *Accident Ass'n*, 82 Iowa, 652 (61 N. W. 485); *Robinson* v. *Accident Ass'n*, 68 Fed. 825; *Ripley* v. *Assurance Co.*, 2 Bigelow, Ins. Rep. 738.

It was not within the province of the court to determine that this was a case of suicide. It is not a case in which it can be said that the testimony is inconsistent with any other theory than suicide, or that it was inconsistent with the theory that the death was accidental. There were many circumstances surrounding the case which should be taken into consideration in determining the question whether the death was from suicide or homicide. Under such circumstances, it was for the jury to determine the question.

There are some other questions which relate to the introduction of the testimony that should be considered. It is claimed by the defendant that several witnesses were permitted to testify to conclusions of fact. Louis Cartier, after testifying that there were just two footprints at the head of the body, and no indication of a body falling in the snow, was asked the following question:

"From your examination of the snow and the body and everything about the body, what do you say to whether it had fallen or had been placed there by some other person?

"*A.* I should judge the body was placed there by persons unknown."

Counsel for the defendant contends that the witness might as well have been permitted to give his opinion as to whether the man had committed suicide or had been murdered.

John A. Allo testified that at his head were two footprints; looked as though some one had stepped there and laid him there; his right foot lay on top of the left toe, etc. He was then asked the same question that was asked Cartier, and answered, "I should judge it had been placed there."

Charles Edwards testified:

"I examined the snow about where the body was lying; there were no footprints in the snow at all where his feet were; it looked as if his body must have been laid there; no impression in the snow, as if a body would fall; no foot tracks of any description nearer than the cutter track."

He was then asked:

"Now, Mr. Edwards, assuming that a man was riding in a cutter, drawn by a horse, either moving or standing on the bridge where you found the body, if he had been killed, while in the cutter, with a pistol shot back and above his right ear and going through the brain, could he have fallen from the cutter, and been in the position, and without making any other imprints in the snow at that point than those that you found?"

He answered: "I don't think it could."
Again:

"If a man had been standing upon his feet upon that bridge, and by his own action sent a revolver shot through his brain as I have described, what do you say as to whether the position of the body and imprints in the snow could have been the same as those you found?

"*A.* I don't think the body could; there must have been some foot marks somewheres.

"*Q.* Mr. Edwards, taking into consideration the condition of the snow, the location of the body, and everything as you found it, what is your opinion as to whether the body had been placed there by some one?

"*A.* My judgment is that it must have been placed there."

We think this testimony was incompetent. Counsel seem to have considered the question of whether the body fell from the cutter or was placed there by some other person as the vital point in the case. It could only be determined from the position of the body and surrounding conditions. It was peculiarly the province of the jury to take into consideration these things, and themselves determine the conclusions to be drawn therefrom. These witnesses were permitted to do it for them.

Again, the defendant sought to show that the deceased had for some months been intemperate in his habits, and

that he was in straitened circumstances pecuniarily, and that he was worried about his affairs. This testimony was excluded. We think that these were circumstances which had a legitimate bearing upon the question, and the testimony should have been admitted.

We are constrained to reverse the judgment and order a new trial.

MOORE, GRANT, and MONTGOMERY, JJ., concurred. LONG, J., did not sit.