GATES *v.* NEW YORK LIFE INSURANCE COMPANY

OPINION OF THE COURT

1. INSURANCE—DEATH—ACCIDENTAL—DOUBLE INDEMNITY—PROOF.

An action to recover double indemnity benefits under a life insurance policy places the burden of proving that death was accidental upon the plaintiffs.

2. INSURANCE—DEATH—ACCIDENTAL—STANDARD.

Whether an insured's death is accidental depends upon whether his death was unforeseen, involuntary or unexpected, that is,

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 43 Am Jur 2d, Insurance § 2015.
[2, 3] 43 Am Jur 2d, Insurance §§ 1219, 1221, 1222.
[4] 29, 30 Am Jur 2d, Evidence §§ 844, 845, 1082.
    58 Am Jur, Witnesses §§ 675, 767 *et seq.*
[5] 43, 44 Am Jur 2d, Insurance §§ 1196, 1266, 1968.
[6] 44 Am Jur 2d, Insurance §§ 1965, 1968.
[7] 53 Am Jur, Trial §§ 340, 348, 350, 362, 385, 394.
[8–10] 30 Am Jur 2d, Evidence § 1165.
[10] 30 Am Jur 2d, Evidence §§ 1080–1087.
[11] 30 Am Jur 2d, Evidence § 1086.
    53 Am Jur, Trial §§ 367–370, 388, 401.
[12] 58 Am Jur, Witnesses § 792 *et seq.*
[13] 44 Am Jur 2d, Insurance §§ 2049–2052.
[14] 53 Am Jur, Trial §§ 349, 361–363, 387, 390, 406.
[15] 39 Am Jur, New Trial §§ 121, 129–139.

not according to the usual course of things, or not as expected but if an insured's death follows from ordinary means, voluntarily employed, in a not unusual or unexpected way, it cannot be called a result effected by accidental means or an accidental death.

3. Insurance—Death—Accidental.

Insured's death was not an unforeseen or unexpected happening and therefore was not accidental where, knowing that he was wanted by law enforcement officers, he armed himself and put into operation a sequence of events which resulted in his death.

4. Evidence—Witnesses—Credibility—Prior Inconsistent Statements.

Prior inconsistent statements of a witness can be used only to attack the credibility of that witness.

Dissenting Opinion

Levin, P. J.

5. Insurance — Death — Accidental — Proof — Prima Facie — Presumption.

A prima facie *case of accidental death was established where plaintiffs proved that the insured was killed by gunshot, as there is a presumption that a violent death is accidental, and this presumption is not limited to a presumption against suicide.*

6. Evidence—Death—Accidental—Presumption—Rebuttal.

· *The presumption that a violent death is accidental is evidence and remains evidence, although rebutting evidence is introduced, and a trial court, in deciding whether the rebutting evidence is so overwhelming that a verdict should be directed, should determine the propriety of a directed verdict just as it would in any other case.*

7. Motions — Directed Verdict — Propriety — Evidence — Permissible Inferences.

A directed verdict *against a litigant is proper only if the evidence and permissible inferences therefrom, viewed most favorably to that litigant, leave no room for disagreement among reasonable men.*

8. Evidence — Presumptions — Rebuttal — Inferences — Mandatory — Permissible.

A presumption, *whether common law or statutory, establishes a mandatory inference in the absence of rebuttal evidence but*

*if rebuttal evidence is admitted, that established inference is
downgraded from a mandatory to a permissible inference.*

9. EVIDENCE—PRESUMPTIONS—WITNESSES—CREDIBILITY—INTEREST—
   EVALUATION.
   *A trier of fact must evaluate not only the credibility of witnesses
   but also consider their interest as it reflects upon their cred-
   ibility where the question is whether a presumption has been
   overcome by the testimony of those witnesses.*

10. WITNESSES—CREDIBILITY—INTEREST—EVALUATION.
    *Credibility and interest of two police officers testifying regarding
    the death of an insured in a shoot-out precluded direction of
    a verdict in favor of defendant insurance company where the
    officers' versions of the shooting were contradictory, one of
    them was not only impeached by a prior inconsistent state-
    ment of his given to the state police on a crucial aspect of the
    circumstances of the insured's death but also he admitted
    firing shots at the insured's car after it had been stopped, and
    the other officer admitted killing the insured, it being evident
    that unless these officers' explanations in justification for the
    insured's death were believed, they both faced civil and criminal
    charges for what otherwise would have been a tortious and
    criminal killing.*

11. TRIAL—JURY—DIRECTED VERDICT—EVIDENCE.
    *A verdict may not be directed where the evidence relied on to
    support that verdict is contradicted by any evidence or by
    any facts or circumstances, or where the evidence relied on is
    in any way improbable or discredited, or any legitimate in-
    ference, inconsistent with a directed verdict, may be drawn
    even where there is no issue of witnesses' credibility and no
    showing of interest on the part of those witnesses.*

12. WITNESSES—CONTRADICTION—IMPEACHMENT.
    *A party may contradict his own witness, even if he cannot
    impeach him for if it were otherwise, an attorney would be
    at the mercy of his first witness.*

13. INSURANCE — DEATH — ACCIDENTAL — EVIDENCE — PRESUMP-
    TIONS — CREDIBILITY — DIRECTED VERDICT — PROPRIETY.
    *Plaintiffs, having the benefit of a presumption that their insured's
    death was accidental, established a* prima facie *case when
    they proved that the insured's death was caused by a gunshot,
    and where the only evidence contradicting that presumption
    was the inconsistent, contradictory, and partially impeached*

testimony of two police officers involved in a shooting fray with the insured when he was killed, it was error for the court to direct a verdict in favor of defendant insurance company where a jury could properly have disbelieved the officers' testimony and, relying on the accidental death presumption, could have found that the insured met his death by accidental means.

14. MOTIONS—JUDGMENT—DIRECTED VERDICT—PROPRIETY.

A trial judge cannot substitute his own evaluation of witnesses' credibility for a jury's evaluation and it is error to grant a directed verdict, or a judgment notwithstanding the verdict, based upon his judicial evaluation of the witnesses.

15. TRIAL—JURY—PERVERSE VERDICT—NEW TRIAL.

If a judge thinks a jury has reached a perverse verdict, he may set it aside and order a new trial, but he cannot take upon himself the jurors' functions, and their right of judgment.

Appeal from Benzie, William R. Peterson, J. Submitted Division 3 February 13, 1969, at Grand Rapids. (Docket No. 5,198.) Decided December 10, 1969.

Complaint by Theodore K. Gates and Verna Gates, beneficiaries of a life insurance policy, against New York Life Insurance Company, a New York corporation, for recovery of double indemnity benefits. Judgment for defendant. Plaintiffs appeal. Affirmed.

*Philip A. Clancey,* for plaintiffs.

*Murchie, Calcutt & Brown,* for defendant.

Before: LEVIN, P. J., and HOLBROOK and DANHOF, JJ.

DANHOF, J. Plaintiffs commenced suit against defendant insurance company, as beneficiaries of a life

insurance policy on the life of the deceased, alleging that the death of the insured, their son, was "accidental" under the terms of the insurance policy, and therefore, they were entitled to an additional $5,000 arising out of the double indemnity provisions of the policy. It is to be noted that the defendant company before the institution of the suit paid the face amount of the policy which was $5,000.

A jury trial was commenced in Benzie county circuit court by the plaintiffs. At the close of the plaintiffs' proofs, a directed verdict was entered in favor of the defendant. A motion for a new trial was made and denied, and from this denial the plaintiffs appeal.

On appeal all testimony must be viewed in the light most favorable to the plaintiffs. A review of the record discloses there was no error committed in granting the directed verdict. Since this was an action to recover the double indemnity benefits under the policy the burden of proving that the death of the assured was accidental rested on the plaintiffs, see *Dimmer* v. *Mutual Life Ins. Co. of New York* (1938), 287 Mich 168; *Turner* v. *Mutual Benefit Health & Accident Association* (1946), 316 Mich 6. The standard in this state is whether the death of the deceased was accidental, unforeseen, involuntary or unexpected, that is, not according to the usual course of things, or not as expected; and if a result is such as follows from ordinary means, *voluntarily employed,* in a not unusual or unexpected way, it cannot be called a result effected by accidental means or accidental death. *Turner, supra.* Also, *Furbush* v. *Maryland Casualty Co.* (1902), 131 Mich 234. See also *Hooper* v. *State Mutual Life Assurance Company of Worcester, Massachusetts* (1947), 318 Mich 384, which case quotes with approval *Furbush, supra,* stating on p 391.

"It is a well established rule that where insured is intentionally injured by another, and the injury is *not* the result of misconduct or an assault by the insured, but is unforeseen insofar as he is concerned, the injury is accidental within the meaning of accident policies." (Emphasis supplied.)

It is obvious from the record that the plaintiffs had not sustained the burden of proof required of them. The deceased, knowing full well that he was wanted by law enforcement officers, armed himself, and put into operation the sequence of events which resulted in his death. It is clear that his death was not an unforeseen or unexpected happening; to the contrary, it was quite predictable that great bodily injury or death will result from such activity. Accordingly, the death of the deceased was not accidental.

Nor do we think that the court erred in refusing to allow the out-of-court statement of officer Alcar to be introduced as substantive evidence. It is well established that prior inconsistent statements of a witness can be used only to attack the credibility of that witness. See *Rosenberg* v. *Mageda* (1930), 251 Mich 696; *Gabrish* v. *Morse* (1960), 361 Mich 39.

Affirmed, costs to the appellee.

Holbrook, J. concurred.

Levin, P. J. (*dissenting*). The plaintiffs, beneficiaries of a life insurance policy, commenced this action to recover a double indemnity payable upon accidental death. The majority affirm a directed verdict for the defendant on the ground that all the testimony showed that the insured, William R. Gates, set in motion a course of events likely to result in death and, thus, his death was not accidental.

Both the majority and I are in agreement that
if Gates did, in fact, arm himself and fire at the
police officers who had stopped him, his death by a
gunshot fired by one of the officers was not acci-
dental.[1] I cannot agree, however, that the jury was
bound to believe the testimony of the police officers
even though their testimony was essentially undis-
puted. As will appear, the officers were interested
witnesses, their testimony was contradictory and
one of them was impeached by a prior inconsistent
statement on a crucial aspect of the case.

The plaintiffs established a *prima facie* case when
they proved that Gates was killed by gunshot. There
is a presumption that a violent death is accidental.
This presumption is not, as defendant asserts, limit-
ed to a presumption against suicide.[2] It has been
applied in cases where both the plaintiff beneficiary

---

[1] In Michigan, as in most states, death is generally deemed ac-
cidental where it can properly be viewed as unforeseen and un-
expected, not the result of misconduct by the decedent, such as
the initiation of a course of action likely to result in death. *Turner
v. Mutual Benefit Health & Accident Association* (1946), 316 Mich
6; *Furbush* v. *Maryland Casualty Co.* (1902), 131 Mich 234; *Hooper
v. State Mutual Life Assurance Co. of Worcester, Massachusetts*
(1947), 318 Mich 384; *Utter* v. *The Travelers' Insurance Company*
(1887), 65 Mich 545. Generally, see 44 Am Jur 2d, § 1219 *et seq.*,
p 64.

Clearly, if Gates, while armed with a dangerous weapon, assaulted
the police officers his death was not accidental. However, merely
because Gates failed to stop when pursued by the police does not
*require* a finding that his death was not accidental. The question
whether it could properly be anticipated that the police might end
up shooting him, whether he had initiated a course of events which
was likely to result in his death, are jury questions, not questions
of law for the court.

And even if Gates had initiated a deadly course of events, if the
jury were to conclude that he thereafter made a good faith effort
to break off the contest (*e.g.*, that when he stopped the car he did
so in good faith to surrender) and that the officers then commenced
an unprovoked attack upon him, they would have a right to find
that his death was accidental. See Anno: Injury to or death of
insured while assaulting another as due to accident or accidental
means, 26 ALR2d 399, 432. See, also, 44 Am Jur 2d, Insurance,
§§ 1245, 1248, pp 91, 93–95.

[2] See *Turner* v. *Mutual Benefit Health & Accident Association,
supra,* 316 Mich, at p 14.

and the defendant insurer were in agreement that a third party killed the person whose life was insured and where, as here, the issue is whether the killing was justified.[3] This presumption is an expedient of the law. It recognizes that dead men tell no tales and that one who kills another is bound—indeed, had better be able—to justify his deed.[4]

The presumption that a violent death is accidental is evidence in the case and remains evidence although rebutting evidence is introduced. In deciding whether the rebutting evidence is so overwhelming that a verdict should be directed, the same standard is to be applied as in a case where the plaintiff does not rely on a presumption.

"The standard used to determine the propriety of a directed verdict is the same as if the presumption, as a rule of law, were never involved—namely, a directed verdict against a litigant is proper only if the evidence *and permissible inferences therefrom,* viewed most favorably to that litigant, leave no room for disagreement thereon among reasonable men." *In re Wood Estate* (1965), 374 Mich 278, 291 (5 ALR3d 1). (Emphasis by the Court.)

In *Snow* v. *National Bank of Ludington* (1969), 16 Mich App 595, our Court reversed a directed verdict against a plaintiff who relied upon a statutory

---

[3] See *Martin* v. *Mutual Life Insurance Company of New York* (1928), 106 W Va 533 (146 SE 53); *New York Life Insurance Company* v. *Jennings* (1939), 61 Ga App 557 (6 SE2d 431); *Metropolitan Casualty Insurance Co.* v. *Chambers* (1918), 136 Ark 84 (206 SW 64). But see *Connecticut General Life Insurance Company* v. *Breslin* (CA 5, 1964), 332 F2d 928; *Mutual Life Insurance Co. of New York* v. *Sargent* (CA 5, 1931), 51 F2d 4; *Smith* v. *Mutual Life Insurance Co. of New York* (CA 5, 1929), 31 F2d 280, *certiorari denied* 279 US 868 (49 S Ct 482, 73 L Ed 1005).

Generally, see Proof of Death or Injury from External and Violent Means as Supporting Presumption or Inference of Death by Accidental Means Within Policy of Insurance, 12 ALR2d 1264; 44 Am Jur 2d, Insurance, § 1965, pp 904–907.

[4] *Cf. Utter* v. *The Travelers' Insurance Company, supra,* 65 Mich at pp 553, 554.

presumption. We stated that under *In re Wood Estate, supra,* common law and statutory presumptions operate in the same manner. In the absence of rebuttal evidence the presumption establishes a mandatory inference. If rebuttal evidence is admitted, the inference is downgraded from a mandatory to a permissible inference. We concluded (p 597):

"Only where the rebutting evidence is so overwhelming that all reasonable men must agree that the statutory inference has been overcome may a trial judge properly direct a verdict."

The testimony of the police officers, if believed, was, indeed, sufficient to overcome the presumption. The jury, however, was not obliged to believe their testimony. As we stated in *Snow,* where the question of whether the presumption has been overcome depends upon testimony, it is the function of the trier of fact (in that case and this one, the jury) to evaluate the credibility of the witnesses (p 598) "on which latter issue the interest of the witnesses should be considered."

Gates was killed by a police officer, Sheriff George Pelton. Pelton stopped Gates on a traffic charge. Gates drove off when Pelton attempted to arrest him. After a long automobile chase, Gates stopped his car. Officer Alcar testified that he and another officer immediately jumped out of the pursuing cruiser and shot out the tires of Gates' car. He said he then observed that Gates had a shotgun and ducked behind Gates' car to reload his pistol; he did not see the shooting of Gates, but he heard a series of shots —one shot, then two shots, then two more shots— in rapid succession. He said he observed Sheriff Pelton standing near the left rear door of Gates' car before any of these shots were fired.

Alcar's testimony was impeached by a prior inconsistent statement made by him to the state police

on the night of the shooting. In that statement he asserted that Pelton fired the first shot at Gates after Gates turned abruptly in his seat.

Sheriff Pelton's testimony was somewhat contradictory as to the sequence of events. Suffice it to say for this purpose, that at one point he testified that Gates fired the first shot as he, Pelton, was moving across the highway toward Gates' car. This, of course, was contradicted by the testimony of officer Alcar that Pelton had reached the left rear door of Gates' car before any shots were fired.

Pelton testified that he fired his first shot at Gates from the left rear of the Gates' car and then ran back across the highway, whereupon additional shots were fired. Palton testified that Gates discharged the shotgun two more times, and then he, Pelton, fired one more shot, his second shot. This was the fatal shot; both officers testified that immediately after the last shot was fired Gates slumped over with a moan. The fatal shot entered Gates' back on the left side just above the armpit and penetrated his heart.

In addition to the difference between Alcar's and Pelton's testimony concerning the sequence of events, the jury had a right to consider the following in deciding whether to adopt Pelton's testimony.

(1) Pelton testified that, after reaching the left rear of Gates' car, he decided to run back across the highway to seek cover. The jurors might well have regarded it incredible that an experienced police officer would leave a place of cover (the left rear of Gates' car) and, exposing his rear to a man said to have been armed with a shotgun, run back across a highway ostensibly for the purpose of seeking the cover that he had just left.

(2) Pelton testified that he fired his first shot from the left rear of Gates' car. The fatal shot en-

tered Gates' body from his left rear.    Yet Pelton testified that the fatal shot was his second shot and that he fired that shot from behind the cruiser parked across the road while he was engaged in a gunfight. with Gates who, presumably, was facing Pelton and would not have had his back to him. Indeed, Pelton testified that at the time he fired his second shot Gates was facing in the direction of the cruiser parked across the highway.    How then, the jurors might have properly asked, could Pelton's second shot have entered from the left rear of Gates' shoulder?

(3) When Gates was first stopped by Pelton for speeding, Pelton removed the keys from the ignition of Gates' car.    But the ignition was not in a locked position; Gates was able to start the car without the key.    He did so and the chase ensued.    During the course of the chase he dropped off two apprehensive passengers.    They testified that Gates did not have a shotgun in the car.    It was not shown where or how Gates had acquired a shotgun during the course of the chase although there was an interval of time during which he eluded the pursuing police and could have obtained one.    Gates was not shown to have had a second set of keys which would have enabled him to open the trunk of his car.    Pelton had Gates' keys.

(4) The shooting occurred around midnight.    Pelton testified that after Gates stopped his car he, Gates, opened his door and that the interior dome light in the Gates' car went on and was on throughout the shooting.    It appears from the testimony of the officers that the shooting out of the tires, the alleged gunfight and the shooting of Gates occurred within moments after Gates' car was stopped.    There was little time for Gates' eyes to adjust to the new lighting situation resulting from the opening of the door

of his car until the shots were fired. Gates would
have had extremely poor visibility firing from a
lighted interior to a dark exterior. The jurors could
properly have concluded that Gates would have been
firing blindly, while Pelton was firing at a clearly
lighted target. The jurors could have weighed these
facts and permissible inferences in deciding whether
to believe Pelton's testimony. The jurors could
properly have decided that Gates stopped the car
and opened the door because he had decided to sur-
render and that the shooting was an accident, the
result of a misunderstanding attributable to the heat
of the chase and the confusion caused by the shoot-
ing out of the tires.

Both Pelton and Alcar were interested witnesses.
Alcar had admitted firing shots at Gates' car. Pel-
ton admitted killing him. Unless their explanations
in justification for the shooting were believed, they
both faced civil and criminal charges for what other-
wise would have been a tortious and criminal killing.

The interest of a witness may always be shown
"for the purpose of drawing in question the credibil-
ity of such witness." MCLA § 600.2158 (Stat Ann
1962 Rev § 27A.2158) ;[5] the issue of credibility is al-
ways to be decided by the trier of fact. As stated in
*Woodin* v. *Durfee* (1881), 46 Mich 424, 427, "a jury
may disbelieve the most positive evidence, even
when it stands uncontradicted." This principle
has been reiterated in many cases.[6]

If a judge thinks a jury reached a "perverse ver-
dict" he may set it aside and order a new trial, but

---

[5] 5 Callaghan's Michigan Pleading & Practice (2d ed) § 37.205,
pp 557, 558. See *Goppelt* v. *Burgess* (1902), 132 Mich 28, 30;
*Ball-Barnhart-Putman Co.* v. *Lane* (1903), 135 Mich 275.

[6] *Crampton* v. *Crampton* (1919), 205 Mich 233, 241; *Cuttle* v.
*Concordia Mutual Fire Ins. Co.* (1940), 295 Mich 514, 519; *Hughes*
v. *John Hancock Mutual Life Insurance Company* (1958), 351 Mich
302, 308; *Baumgartner* v. *Ham* (1965), 374 Mich 169, 174; *Wolfgram*
v. *Valko* (1965), 375 Mich 421, 435 (per Black, J., in an opinion
signed by three other justices).

he cannot take upon himself their function, their
right of judgment. *Woodin* v. *Durfee, supra,* p 427.[7]
Even in a case where there is no issue of credibility
and no showing of interest on the part of the wit-
nesses (and the interest of both police officers in this
case is apparent), a verdict may not be directed
where the evidence relied on to support the verdict is
contradicted "by any testimony given in the case
\* \* \* or by any facts or circumstances in the
case," or where the evidence relied on it "in any
way improbable or discredited" or any legitimate in-
ference, inconsistent with a directed verdict, may
be drawn.[8]

In this case, in addition to the interest of the two
police officers, their testimony was in part contradic-
tory and there were facts and circumstances and
legitimate inferences that could have been drawn
inconsistent with their testimony.

---

[7] The distinction between a trial judge's role in directing a verdict
and in passing upon a motion for a new trial is preceptively discussed
in *Dyer* v. *MacDougall* (CA 2, 1952), 201 F2d 265, 271, 272 (Frank,
J., concurring) :

"Indeed, the important difference between a trial judge's power
on a motion for a new trial and on a motion for a directed verdict
is precisely that on a new-trial motion he may base his action on his
belief or disbelief in some of the witnesses, while on a directed-
verdict motion he may not. \* \* \*

"On a motion for a new trial, the judge acts 'as the thirteenth
juror', *i.e.*, he evaluates the credibility of the orally-testifying wit-
nesses and therefore their demeanor. But on a motion for a directed
verdict he does not. The rule that a trial judge may legitimately
consider demeanor in ordering new trials means that his new-trial
orders are seldom reviewable; on the other hand, the rule that he
may not legitimately consider demeanor in considering directed
verdict motions means that his orders on such motions are readily
reviewable."

Similarly, see *Reid* v. *Maryland Casualty Co.* (CA 5, 1933), 63
F2d 10 (illuminating opinion by Judge Hutcheson).

[8] *Boudeman* v. *Arnold* (1918), 200 Mich 162, 164. Similarly, see
*Hagan* v. *Chicago, D. & C. G. T. J. R. Co.* (1891), 86 Mich 615;
*Kaminski* v. *Grand Trunk W. R. Co.* (1956), 347 Mich 417, 428;
*Green* v. *Detroit U. R.* (1920), 210 Mich 119, 125.

Pelton's testimony was taken on deposition and was offered by the plaintiff at the time of trial.[9] Even if, as the defendant contends, this precluded the plaintiffs from attempting to impeach Pelton, plaintiffs did not attempt to do so. Pelton's deposition was read as it was transcribed. Since he was not present at the trial, no questions of an impeaching nature were put to him at the trial. No attempt was made to impeach him through the testimony of other witnesses. What the defendant is really saying when it says that the plaintiffs made Pelton their own witness is that they are bound by his testimony. However, it is well established that a party may contradict his own witness, even if he cannot impeach him. As was said in *Darling* v. *Thompson* (1896), 108 Mich 215, 218, 219:

"We think counsel have overlooked the distinction between a contradiction and an impeachment. A party cannot impeach his own witness, but he may contradict him; for, if it were otherwise, he would be at the mercy of his first witness. A moment's reflection will show the far-reaching effect of the rule contended for."[10]

[9] See GCR 1963, 302.6. *Cf.* MCLA § 600.2161 (Stat Ann 1962 Rev § 27A.2161).

[10] Similarly, see *People* v. *Lee* (1943), 307 Mich 743, 752; *Persail* v. *Moseley* (1955), 343 Mich 78; *Chicago College of Osteopathy* v. *Littlejohn* (1926), 234 Mich 528, 538; *Kaminski* v. *Grand Trunk W. R. Co.*, *supra*, 347 Mich at p 425; *People* v. *Fred W. Thomas* (1967), 7 Mich App 519, 531; *Osborn* v. *League Life Insurance Company* (1969), 20 Mich App 19; 5 Callaghan, Michigan Pleading and Practice (2d ed), § 37.217.

While there are statements that a party who places a witness on the stand vouches for his credibility and is bound by his answers (see *Fleegar* v. *Consumers Power Co.* (1933), 262 Mich 537, 540, 541; *Murray* v. *New York Central R. Co.* (1952), 322 Mich 159, 168), they overstate the matter. By calling a witness a party vouches for his credibility only to the extent that he may not, subject to other exceptions which it is not necessary now to consider, impeach him. See, generally, McCormick on Evidence, § 38, pp 70–73; *cf. Ruhala* v. *Roby* (1967), 379 Mich 102.

Summarizing, the plaintiffs had the benefit of a presumption that Gates' death was accidental and on that basis established a *prima facie* case when they proved that his death was caused by a gunshot. The only evidence contradicting that presumption is the testimony of two interested witnesses. The testimony of one of them was impeached by a prior inconsistent statement on a crucial aspect of the case. The other witness, a clearly interested party, gave an account which was inconsistent in part with the physical evidence of the bullet wound and with his own and the other officer's testimony and permissible inferences concerning the events during the shooting. The jury could properly have disbelieved the testimony of both officers and, relying on the presumption, found Gates' death to have been accidental. If the jury had been allowed to bring in a verdict for the plaintiffs and had done so and the judge, because of his own evaluation of the officers' credibility, thought that to be a "perverse verdict," he could have granted a motion for a new trial. He could not, however, substitute his own evaluation of credibility for the jury's and grant a judgment notwithstanding the verdict or direct a verdict. *Woodin* v. *Durfee, supra;* see also, footnote 7.

I would reverse the directed verdict and remand for a new trial.